UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

| | |
|---|---|
| SECURITIES AND EXCHANGE COMMISSION,<br><br>Plaintiff,<br><br>v.<br><br>MAGDALENA TAVELLA, ANDRES HORACIO FICICCHIA, GONZALO GARCIA BLAYA, LUCIA MARIANA HERNANDO, CECILIA DE LORENZO, ADRIANA ROSA BAGATTIN, DANIELA PATRICIA GOLDMAN, MARIANO PABLO FERRARI, MARIANO GRACIARENA, and FERNANDO LOUREYRO,<br><br>Defendants. | Civil Action No. *13-CIV-4609* |

---

**PLAINTIFF SECURITIES AND EXCHANGE COMMISSION'S MEMORANDUM IN SUPPORT OF ITS APPLICATION FOR AN *EX PARTE* TEMPORARY RESTRAINING ORDER FREEZING ASSETS AND OTHER EMERGENCY RELIEF, AND FOR AN ORDER TO SHOW CAUSE WHY A <u>PRELIMINARY INJUNCTION SHOULD NOT BE ISSUED</u>**

Plaintiff U.S. Securities and Exchange Commission (the "Commission") brings this civil law enforcement action against Magdalena Tavella, Andres Horacio Ficicchia, Gonzalo Garcia Blaya, Lucia Mariana Hernando, Cecilia De Lorenzo, Adriana Rosa Bagattin, Daniela Patricia Goldman, and Mariano Pablo Ferrari (collectively, the "Selling Defendants") on an emergency basis to prevent millions of dollars of proceeds from unlawful sales of securities being transferred out of the country. Over the past month, the Selling Defendants have sold almost $34 million worth of securities in Biozoom, Inc. (f/k/a Entertainment Art, Inc.), a penny stock company traded on the Over-the-Counter Bulletin Board ("OTCBB"). No registration statement

1

was in effect for the Selling Defendants' resale of securities, nor were their sales exempt from registration. Thus, the Selling Defendants' sales were in violation of Sections 5(a) and 5(c) of the Securities Act of 1933 (the "Securities Act") [15 U.S.C. § 77e(a) and (c)]. The Selling Defendants currently have over 1.3 million shares of Biozoom stock sitting in their brokerage accounts as well as millions of dollars of proceeds from their unlawful sales. The Selling Defendants have already transferred offshore nearly $17 million of their ill-gotten proceeds. Therefore, unless these assets are frozen, the Selling Defendants' unlawful sales are likely to continue as are their overseas transfers of the proceeds of their unlawful sales.

In addition, the Commission brings this civil law enforcement action against Mariano Graciarena and Fernando Loureyro. These defendants recently deposited a total of roughly 4.5 million shares of Biozoom stock into their respective brokerage accounts. Like the shares sold by the Selling Defendants, there is no registration statement in effect permitting the lawful resale of the Biozoom shares held by Graciarena and Loureyro. Because Graciarena and Loureyro are likely to engage in the sale of securities in violation of Sections 5(a) and 5(c) of the Securities Act, the Commission seeks to freeze the brokerage accounts holding their Biozoom shares to prevent the resale of those shares until such time as a registration statement is filed and in effect.

## FACTUAL BACKGROUND

### A.   Biozoom (f/k/a Entertainment Art)

Biozoom is a Nevada corporation with its principal place of business in Kassel, Germany. Biozoom's common stock is registered with the Commission pursuant to Section 12 of the Securities Exchange Act of 1934 ("Exchange Act") [15 U.S.C. §78l] and is quoted on the OTCBB under the trading symbol "BIZM." (*See* Declaration of Ricky Sachar ("Sachar Decl.") ¶ 2 (attached hereto as Exhibit A).) Prior to becoming Biozoom in April 2013, the company was

known as Entertainment Art, Inc., a developmental stage company formed to design, produce, and sell a line of fashionable zip bags, with offices located in New York. (*Id.* at ¶¶ 2-3.)

Beginning in late 2007, Entertainment Art sold stock to 34 individual investors in private placements. (*Id.* at ¶ 3.) On July 18, 2008, Entertainment Art filed a Form S-1 registration statement to register the resale transactions for the 34 shareholders who acquired Entertainment Art stock in these private placements. In particular, the S-1 registration statement covered 610,000, or approximately one-third of the company's 1.81 million outstanding shares. (*Id.*) The remaining 1.2 million shares were held by three officers of the company. (*Id.* at ¶ 4.)

### B. Medford Financial, Ltd. Acquires Entertainment Art

In May 2009, Entertainment Art was purchased by Medford Financial, Ltd. ("Medford"), a Belizean entity. (*Id.* at ¶ 5.) All of the Entertainment Art shares then outstanding were acquired by Medford, including the 610,000 shares sold in private placement transactions to individuals. (*See* Declaration of David Lubin ("Lubin Decl.") ¶¶ 3-4 (attached hereto as Exhibit B).) Accordingly, all shareholders relinquished their right to shares in Entertainment Art at that time. (*Id.* at ¶ 4.) On June 30, 2009, after the sale was consummated, Entertainment Art approved a 33:1 forward stock split that became effective in July and increased the number of outstanding shares to 59,730,000. (Sachar Decl. ¶ 8.)

### C. Entertainment Art is Acquired by Le Mond Capital And Later Changes Its Name to Biozoom

In October 2012, Entertainment Art was acquired by Le Mond Capital, a company controlled by Sarah Deutsch. (*Id.* at ¶¶ 9-11.) In a Form 8-K filed on October 25, 2012, the company reported that 39.6 million shares – approximately two-thirds of the outstanding shares – were purchased by Le Mond in a private transaction. (*Id.* at ¶ 9.) However, the stock certificates originally issued to the Entertainment Art private placement investors — shares that were

relinquished by investors in connection with the sale of Entertainment Art to Medford in May 2009 — were also provided to counsel for Sarah Deutsch. (*Id.* at ¶ 12; *see also* Lubin Decl. ¶ 4.)

On March 12, 2013, Entertainment Art announced a transaction pursuant to which its newly formed subsidiary, Biozoom Technologies, Inc., acquired certain patents, licenses, and related assets from each of three separate companies in exchange for cash of $50,000 and the issuance of 39 million shares of Entertainment Art common stock. (Sachar Decl. at ¶ 14.) Entertainment Art described that, through Biozoom, it was no longer in the business of designing fashionable zip bags but was now in the business of researching, developing, and licensing technologies relating to the mobile remote collection of biomedical data. (*Id.* at ¶ 15.) On April 1, 2013, Entertainment Art changed its name to Biozoom. (*Id.* at ¶ 20.)

### D. Defendants Open U.S. Brokerage Accounts and Deposit Millions of Shares of Biozoom Stock

From January 2013 through March 2013, shortly before Entertainment Art changed its name to Biozoom and announced a dramatic change in its business, brokerage accounts were opened at Legend Securities, Inc., a registered broker-dealer, by defendants De Lorenzo, Blaya, Hernando, and Ficicchia. (*Id.* at ¶ 21.) Between May 10 and June 14 of this year, brokerage accounts were opened at Scottsdale Capital Advisors, a registered broker-dealer, by defendants Bagattin, Ferrari, Goldman, Tavella, Loureyro and Graciarena. (*Id.* at ¶ 22.) Defendant Ficicchia also opened an account at Scottsdale Capital Advisors in June 2013. (*Id.* at ¶ 94 n.5.) Account opening documentation (from Legend Securities and Scottsdale Capital Advisors) completed by the defendants indicates that each of the defendants is a resident of Buenos Aires, Argentina and each defendant provided a copy of his or her passport issued by Argentina. (*Id.* at ¶ 23.)

Prior to the business name change from Entertainment Art to Biozoom, the Selling Defendants (Tavella, Ficicchia, Blaya, Hernando, De Lorenzo, Bagattin, Goldman, and Ferrari) deposited millions of shares of Entertainment Art into their newly opened brokerage accounts. (*Id.* at ¶¶ 26-81.) Four days after opening brokerage accounts at Scottsdale Capital Advisors, defendants Loureyro and Graciarena deposited 2.3 million and 2.145 million Biozoom shares, respectively, into their brokerage accounts. (*Id.* at ¶¶ 82-87.) All told, the ten brokerage accounts opened in the name of the defendants received a total of 20,130,000 shares of Entertainment Art. (*Id.* at ¶ 88.) These shares represented ***100% percent*** of the total shares without a restrictive legend outstanding in Biozoom at the time, and approximately 33% percent of the total outstanding shares of Biozoom. (*Id.*)

E. **There Was No Valid Registration Statement In Place Permitting the Defendants to Resell Their Biozoom Shares**

Absent an applicable exemption, Section 5 of the Securities Act makes it unlawful for any person, directly or indirectly, to offer or sell securities, using the U.S. mails or interstate commerce, unless such offer or sale is registered with the Commission. *See* 15 U.S.C. §77e(a) and (c). In opening their brokerage accounts, each defendant submitted information purporting to show that they could legally sell their securities. Specifically, to deposit securities into their U.S. brokerage accounts, each of the defendants was required to submit documentation concerning the manner in which they obtained the Entertainment Art shares. These documents indicated that the defendants purchased all or a portion of their shares in private sales from the original Entertainment Art investors whose resale transactions for the shares had been registered pursuant to the Form S-1 registration filed by the company in July 2008. (*Id.* at ¶ 98.) Defendants submitted documentation indicating that they acquired their shares from these investors in private transactions from November 2012 to March 2013, and provided copies of

stock purchase agreements that each defendant purportedly entered into with the seller of the shares. (*Id.* at ¶¶ 33, 39, 45, 52, 58, 65, 72, 79, 84, 86.)

Although claiming to have acquired all or a portion of their shares from the original private placement investors in Entertainment Art (the predecessor of Biozoom), those private placement investors had in fact sold and relinquished all their shares in the May 2009 sale of Entertainment Art to Medford — ***three to four years before*** the defendants claimed to have purchased their shares from the private placement investors. (Lubin Decl. ¶¶ 3-4.) Moreover, in connection with its investigation the Commission's staff interviewed many of the private placement shareholders who purportedly sold shares to the defendants as recently as March 2013. (Sachar Decl. ¶¶ 100-116.) These investors unequivocally denied that they had sold any shares of Entertainment Art to any Argentine nationals in 2013, and indicated that they were paid for their shares in 2009. (*Id.*) In fact, defendant Blaya submitted to Legend a stock purchase agreement that he purportedly executed with one of the original private placement investors to acquire Biozoom shares in March 2013. (*Id.* at ¶ 38.) But the purported seller to Blaya had in fact died in 2010 and could not have executed a stock purchase agreement with Blaya in 2013. (*Id.* at ¶ 105.)

In short, the defendants submitted false information regarding how they acquired their Biozoom; they submitted documentation indicating that they had purchased their shares from the original investors in the company (or from persons who had purchased from original investors in the company). Defendants, however, appear to have acquired their shares from the issuer, or a person controlling or controlled by the issuer. (*Id.* at ¶¶ 9-13, 29, 49, 59, 66, 73, 80; *also* Lubin Decl. ¶¶ 3-4.) As described above, the stock certificates originally issued to the Entertainment Art private placement investors were provided to counsel for Sarah Deutsch, an Argentine

6

national who acquired Entertainment Art through her company, Le Mond Capital, in October 2012. (*Id.* at ¶ 9.) Sarah Deutsch controlled Entertainment Art and served in a number of official capacities at the time of the transfers. (*Id.* at ¶ 12.) In her capacity as an officer of the company, she also signed corporate certifications that certified the valid issuance of Biozoom (f/k/a Entertainment Art) stock certificates to some of the defendants. (*Id.* at ¶¶ 29, 49, 59, 66, 73, 80.)[1] Because the defendants acquired their shares "directly or indirectly, from the issuer, or from an affiliate of the issuer, in a transaction or chain of transactions not involving any public offering," the shares are restricted securities. 17 C.F.R. § 230.144(a). There was no registration statement in effect for the sale transactions by the Selling Defendants, nor were the sales exempt from registration. (*Id.* at ¶ 95.)

### F. The Selling Defendants Reap Millions of Dollars Selling Biozoom Shares Before the Commission Suspended Trading of the Shares

Shortly after the Selling Defendants (Tavella, Ficicchia, Blaya, Hernando, De Lorenzo, Bagattin, Goldman, and Ferrari) deposited Biozoom shares in their newly opened brokerage accounts, Biozoom experienced a dramatic increase in its share price following the issuance of a series of press releases by Biozoom. Beginning on May 22, 2013, Biozoom began issuing a series of press releases in which it claimed it "created the world's first portable, handheld consumer device" to instantly measure certain "biomarkers" such as anti-oxidant levels, vitamin absorption and stress levels. (*Id.* at ¶ 89.) These claims were also made by stock promoters, including Global Investors Research, LLP, Stock Preacher.com, among others. (*Id.* at ¶ 90.) For example, on May 16, 2013, The Stock Report published a 24-page research report touting

---

[1] Sarah Deutsch is also in business with at least one of the defendants (Tavella) in Buenos Aires. (Sachar Decl. ¶ 13.)

investment in Biozoom stock, concluding that Biozoom stock, which at the time was trading at $1.10 per share, would yield a 12-month price target of $10.30 a share. (*Id.*)

Following the press releases and stock promotion, Biozoom's stock and volume rose dramatically. On May 16, 2013, Biozoom's stock price was $1.10 per share, but it shot up to over $4 per share in just one month. (*Id.* at ¶ 92.) The volume of shares traded followed a similar pattern. Prior to May 16, 2013, there were no Biozoom shares traded on the OTCBB. (*Id.* at ¶ 93.) However, between May 16 and June 21, 2013, a total of 87,936,300 Biozoom shares traded. (*Id.*)

Although there was no registration statement in effect permitting the Selling Defendants to resell their Biozoom shares, from May 16 to June 19, 2013, the Selling Defendants sold millions of shares in Biozoom for large profits. In total, the Selling Defendants sold 14,078,406 Biozoom shares for proceeds of almost $34 million.[2] (*Id.* at ¶ 94.)

On June 25, 2013, as a result of its preliminary investigation into suspicious trading activity in Biozoom stock, the Commission issued a ten business day trading suspension in Biozoom stock. (*Id.* at ¶ 99.)

### G. The Selling Defendants Wire Their Ill-Gotten Gains to Overseas Accounts

Following their unlawful sales of Biozoom stock, the defendants instructed their brokerages to wire the proceeds of their sales overseas. Defendants Ficicchia, Bagattin, Goldman and Ferrari have already wired nearly $17 million of proceeds from their Biozoom sales to different banks located outside of the United States. (*Id.* at ¶ 97.) In addition, Tavella, Blaya and Hernando have also issued instructions to wire roughly $8 million outside of the United States, but the brokerage firms have not yet executed these wires. (*Id.*) Approximately

---

[2]   To date, Graciarena and Loureyro, who had deposited into their Scottsdale accounts 2,145,000 and 2,300,000 shares, respectively, did not sell any their Biozoom shares.

$16 million in Biozoom sales proceeds currently remain in the Selling Defendants' brokerage accounts. (*Id.* at ¶ 98.)

## ARGUMENT

### I. DEFENDANTS SHOULD BE PRELIMINARILY ENJOINED FROM FURTHER VIOLATIONS OF THE SECURITIES LAWS

To obtain a temporary restraining order or preliminary injunction, the Commission need only show likelihood of success as to (a) current violations and (b) risk of repetition. *See SEC v. Cavanagh*, 155 F.3d 129, 132 (2d Cir. 1998)). Because the Commission approaches the Court "not as an ordinary litigant, but as a statutory guardian charged with safeguarding the public interest in enforcing securities laws," the Commission has a lower burden than a private party seeking a temporary restraining order or preliminary injunction. *SEC v. Mgmt. Dynamics, Inc.*, 515 F.2d 801, 808 (2d Cir. 1975). Thus, unlike private litigants, the Commission need not show irreparable injury, *id.*, and need only make a "proper showing" of violative activity to obtain a temporary restraining order or preliminary injunction against statutory violations. *See* 15 U.S.C. §77t(b); *SEC v. Unifund SAL*, 910 F.2d 1028, 1035 (2d Cir. 1990). A "proper showing" is made where there is "a justifiable basis for believing, derived from reasonable inquiry or other credible information, that such a state of facts probably existed as reasonably would lead the Commission to believe that the defendants were engaged in violations for the statutes involved." *SEC v. GenRefractories Co.*, 400 F. Supp. 1248, 1254 (D.D.C. 1975). The Commission has easily satisfied its burden here.

#### A.   Defendants' Sales of Biozoom Violates Federal Securities Laws

Section 5(a) of the Securities Act prohibits the sale of securities in interstate commerce unless pursuant to an effective registration statement. 15 U.S.C. § 77e. In addition, Section 5(c) of the Securities Act makes it unlawful to offer to sell securities, through the use or medium of a

prospectus or otherwise, unless a registration statement has been filed as to such security or pursuant to an exemption. *Id.* at § 77e(c). A *prima facie* Section 5 violation requires proof of three elements: *first*, that no registration statement was filed or in effect as to the securities; *second*, that the defendant sold or offered to sell these securities; and *third*, that there was a use of interstate means in connection with the offer or sale. *See SEC v. Cavanagh*, 1 F. Supp. 2d 337, 361 (S.D.N.Y. 1998), *aff'd*, 155 F.3d 129 (2d Cir. 1998). Once the Commission establishes a *prima facie* violation, the defendants bear the burden of proving that an exemption applies. *See SEC v. Ralston Purina*, 346 U.S. 119, 126 (1953).[3]

Here, the Commission has established a *prima facie* case that defendants have violated (or will violate) Section 5 of the Securities Act. *First*, no registration statement was filed or in effect permitting defendants to offer or sell their Biozoom shares. (Sachar Decl. ¶ 95.) *Second*, the Selling Defendants have already sold over 14 million shares of Biozoom stock (reaping nearly $34 million in proceeds) without an effective registration statement in effect. (*Id.* at ¶ 94.) Further, there is no registration statement in effect for any of the roughly 4.5 million Biozoom shares held by defendants Graciarena and Loureyro. (*Id.* at ¶ 95.) Thus, an offer or sale of these securities in public markets would violate Section 5. *Third*, trading and sale instructions were communicated to defendants' brokers using instant messages and e-mails. (*Id.* at ¶ 96.) Thus, the defendants have used means of interstate commerce in connection with their securities sales. *See, e.g., SEC v. Shehyn*, No. 04 CV 2003(LAP), 2010 WL 3290977, at *4(S.D.N.Y. Aug. 9, 2010) (observing "[i]nstrumentalities of interstate commerce include telephone and email communications" for purposes of securities law violations).

---

[3] A Section 5 violation does not require a showing of scienter. *See SEC v. Universal Major Indus.*, 546 F.2d 1044, 1047 (2d Cir. 1976).

10

### B. There Is a Likelihood of Future Violations

Once the Commission shows a probable violation of the law, it need only show that there is a reasonable likelihood of a future violation in order to obtain relief. *See Householder*, 2002 WL 1466812, at *5 (citing *SEC v. Holschuh*, 694 F.2d 130, 144 (7th Cir. 1982)). Here, it is reasonably likely that the Selling Defendants' unlawful sales of Biozoom stock (and future violations of the securities laws) will continue.

All told, defendants currently have approximately 5.8 million shares of Biozoom remaining in their brokerage accounts. (Sachar Decl. ¶ 94.) Once the temporary trading suspension in Biozoom shares expires on July 9, 2013, there is a justifiable basis for believing, derived from reasonable inquiry or other credible information, that defendants would (consistent with their conduct over the past month) sell their remaining shares and transfer the proceeds of their unlawful sales out of the country. Because there is no effective registration statement covering defendants' resale of Biozoom stock, each sale of Biozoom stock by the defendants would constitute a violation of Section 5 of the Securities Act.

## II. DEFENDANTS GRACIARENA AND LOUREYRO SHOULD BE ENJOINED FROM SELLING SHARES OF BIOZOOM

Section 20(b) of the Securities Act, 15 U.S.C. § 77t(b), authorizes the Commission to bring an action for a temporary or permanent injunction, or a temporary restraining order:

> Whenever it shall appear to the Commission that any person is engaged or *about to engage* in any acts or practices which constitute or will constitute a violation of the provisions of this title...

15 U.S.C. § 77t(b) (emphasis added); *see also SEC v. Professional Assocs.*, 731 F.2d 349, 352 (6th Cir. 1984) (affirming district court's preliminary injunction "are engaged and are about to engage in acts and practices which constitute and will constitute violations of Sections 5(a), 5(c)" and other provisions of the Securities Act). In cases where the Commission is seeking to enjoin

a person "about to engage in acts or practices which . . . will constitute" a violation of the securities laws, the Commission must only establish a sufficient evidentiary predicate to show that such future violation may occur. *See SEC v. Commonwealth Chem. Securs., Inc.*, 574 F.2d 90, 98-100 (2d Cir. 1978).

Although defendants Graciarena and Loureyro have not yet sold any of the roughly 4.5 million Biozoom shares currently sitting in their brokerage accounts, the evidence shows that it is highly likely that they will do so, and any resale of these shares would constitute a violation of Section 5 of the Securities Act. Indeed, Graciarena's and Loureyro's actions mirror those of the Selling Defendants: they received shares in the same manner as the other defendants and falsely claimed that their shares were acquired from some of the original investors in Entertainment Art. (Sachar Decl. ¶¶ 84, 86, 118.) They opened brokerage accounts in June and within days deposited millions of shares of Biozoom stock. (*Id.* ¶¶ 82, 85-87.) They, like the other defendants, also presented copies of sham stock purchase agreements. (*Id.* ¶ 84; *see also* Lubin Decl. at ¶ 4.) Graciarena's and Loureyro's e-mail addresses match the distinctive format used by the Selling Defendants, and their e-mail accounts were registered at the same regional internet registry and in the same month as the Selling Defendants. (Sachar ¶ 23.) Finally, Graciarena's and Loureyro's approximately 4.5 million shares represent the last segment of Biozoom shares without a restrictive legend, *i.e.*, the ten defendants collectively controlled the entire float of Biozoom shares that did not bear a restrictive legend (until the Selling Defendants began selling their shares in open market transactions). (*Id.* at ¶ 88.) In short, Loureyro's and Graciarena's conduct demonstrates that they were acting in concert with the other defendants and they are likely to sell their shares in violation of Section 5 of the Securities Act unless their Biozoom assets are frozen.

### III. AN ASSET FREEZE IS NECESSARY AND APPROPRIATE

Section 22(a) of the Securities Act, 15 U.S.C. § 77v(a), confers general equity powers upon the Court in a Commission civil enforcement action such as this. *See SEC v. Manor Nursing Ctrs., Inc.,* 458 F.2d 1082, 1103 (2d Cir. 1972). Once the equity jurisdiction of the Court has been properly invoked, the full panoply of equitable remedies is available to the Court, including the ordering of non-injunctive relief in a variety of forms. *See J.I. Case Co. v. Borak,* 377 U.S. 426, 433 (1964); *SEC v. Materia,* 745 F.2d 197, 200 (2d Cir. 1984).

Those broad powers include the authority to freeze assets. *See SEC v. Int'l Swiss Inv. Corp.,* 895 F.2d 1272, 1276 (9th Cir. 1990). An asset freeze serves to prevent waste and dissipation of assets and to ensure the availability of funds for restitution and disgorgement. *See, e.g., Manor Nursing Centers,* 458 F.2d at 1104-06. Because an asset freeze "simply assures that any funds that may become due can be collected," it requires a lesser showing than a preliminary injunction. *Unifund Sal,* 910 F.2d at 1041.

Courts recognize that a disgorgement order for ill-gotten gains will often be rendered meaningless unless an asset freeze is imposed before the entry of final judgment. *See, e.g., Int'l Controls Corp. v. Vesco,* 490 F.2d 1334, 1347 (2d Cir. 1974); *see also SEC v. Vaskevitch,* 657 F. Supp. 312, 315 (S.D.N.Y. 1987); *Gen. Refractories Co.,* 400 F. Supp. at 1259. Thus, an order freezing assets may also properly be directed to other persons or entities which allegedly hold the funds on behalf of the defendant. *See United States v. First Nat'l City Bank,* 379 U.S. 378, 384 (1965) (district court's issuance of temporary injunction freezing assets of non-party bank "eminently appropriate to prevent further dissipation of assets" from foreign corporation's account); *Cavanagh,* 155 F.3d at 136 ("Federal courts may order equitable relief against a person who is not accused of wrongdoing in a securities enforcement action where that person: (1) has received ill-gotten funds; and (2) does not have a legitimate claim to those funds.") (internal

citations omitted). A freeze order may also operate as to assets that are not traceable to the illegal activity. *SEC v. Grossman*, 887 F. Supp. 649, 661 (S.D.N.Y. 1995).

To obtain an asset freeze, the Commission must establish only that it is likely to succeed on the merits, and need not show risk of irreparable injury (unlike a private litigant) or likelihood of a future violation. *See Cavanagh*, 155 F.3d at 132, 136. The Commission may, however, show the likelihood of future violations, and thereby bolster its application for an asset freeze, *SEC v. Margolin*, 1992 WL 279735, at *6-7 (S.D.N.Y. 1992), if a defendant has made "efforts to move assets offshore." *Vaskevitch*, 657 F. Supp. at 315; *see also SEC v. Bremont*, 954 F. Supp. 726, 730 n.3 (S.D.N.Y. 1997).

As discussed above, the Commission has established a *prima facie* case that the defendants violated Section 5 of the Securities Act. Because there is no registration statement filed or in effect for any of the shares of Biozoom currently outstanding, the Commission is likely to succeed on the merits of its Section 5 claim. Moreover, in this case, the need for an asset freeze is clear. In the absence of such a freeze, there is a strong likelihood that assets will be transferred out of the country. Defendants have already transferred nearly $17 million to foreign banks. (*See* Sachar Decl. ¶¶ 97-98.) Furthermore, some defendants have instructed their brokers to wire almost $8 million of proceeds outside of the United States, but the brokerage firms have not yet executed these wires. (*Id.*) Accordingly, in order prevent any further transfers of the defendants' ill-gotten proceeds, an asset freeze is necessary and appropriate.

## IV. DEFENDANTS SHOULD BE ORDERED TO REPATRIATE PROCEEDS OF UNLAWFUL SALES SECRETED ABROAD

Defendants should be required to return proceeds from the unregistered sale of securities to the United States. A federal court's broad equitable authority includes the authority to order the repatriation of the proceeds of illegal securities transactions. *See, e.g., SEC v. Infinity Group*

*Co.*, 27 F. Supp. 2d 559, 561 (E.D. Pa. 1998); *SEC v. Antar*, 831 F. Supp. 380, 398 (D.N.J. 1993) (citing *SEC v. Materia*, 745 F.2d 197, 200 (2d Cir. 1984)).

Defendants have secreted nearly $17 million of proceeds to bank accounts in Cyprus, Switzerland, Belize and Panama. (Sachar Decl. ¶¶ 97-98.) They should be required to return the assets to be held for the benefit of unsuspecting purchasers, so that the Commission can meaningfully pursue enforcement of an order requiring them to disgorge ill-gotten gains and pay civil penalties. *See, e.g., SEC v. Chemical Trust*, No. 00-8015, 2000 WL 33231600, at *12 (S.D. Fla. Dec. 19, 2000) (citing *Manor Nursing Centers, Inc.*, 458 F.2d 1082 (2d Cir. 1972); *United States v. Cannistraro*, 694 F. Supp. 62, 71-72 (D.N.J. 1988) (continuing asset freeze and repatriation order against defendants and relief defendants for their violations of antifraud provisions of the federal securities laws).

## V.   AN ORDER PERMITTING ALTERNATIVE MEANS OF SERVICE IS APPROPRIATE

Rule 4(f)(3) of the Federal Rules of Civil Procedure provides that the Court may authorize alternative means for service of process in foreign countries. The Commission respectfully requests that the Court authorize service upon defendants by serving them, in the manner described in the Commission's proposed order, via international overnight delivery, and e-mail. The Commission will also make reasonable efforts to serve the Defendants personally under Rule 4(f).

## VI.   OTHER REQUESTED RELIEF

The Commission seeks other forms of emergency relief. *First*, in order to protect all documents necessary for full discovery in this matter, the Commission seeks an order preventing the alteration or destruction of documents and other information. Such orders are routinely granted to protect the integrity of litigation. *See, e.g., Unifund SAL*, 910 F.2d at 1040 n.11; *SEC*

*v. Musella,* 578 F. Supp. 425 (S.D.N.Y. 1984). *Second,* the SEC seeks an order for expedited discovery. Rules 26, 30(a), 33(b) and 34(b) of the Federal Rules of Civil Procedure provide for expedited discovery in appropriate circumstances, including motions for preliminary injunction. *See* Fed. R. Civ. P. 26(d) Advisory Comm. Notes (1993) (observing that expedited discovery may be appropriate in matters involving requests for preliminary injunction). The Commission thus requests the Court grant expedited deposition, document, and other appropriate discovery from parties and non-parties, prior to a hearing on its application for preliminary injunction.

## CONCLUSION

For these reasons, the Commission respectfully requests that this Court grant its motion, grant the relief set forth in the proposed order submitted contemporaneously herewith, and grant such other and further relief as this Court deems just and proper.

Dated: July 3, 2013

Respectfully submitted,

*Richard E Simpson*

Richard E. Simpson (RS5859)
U.S. Securities & Exchange Commission
100 F Street, NE Washington, DC 20549
Telephone: (202) 551-4420
SimpsonR@sec.gov

*Of counsel:*

David J. Gottesman
Patrick M. Bryan

Antonia Chion
Ricky Sachar
Deborah Tarasevich
Scott Lowry
Jennie Krasner
U.S. Securities & Exchange Commission
100 F Street, NE
Washington, DC 20549