# EXHIBIT A

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

|  |  |  |
|---|---|---|
| SECURITIES AND EXCHANGE COMMISSION, | : | |
| | : | |
| | : | |
| Plaintiff, | : | |
| | : | |
| v. | : | **DECLARATION OF RICKY** |
| | : | **SACHAR** |
| MAGDALENA TAVELLA, | : | |
| ANDRES HORACIO FICICCHIA, GONZALO | : | |
| GARCIA BLAYA, LUCIA MARIANA | : | |
| HERNANDO, CECILIA DE LORENZO, | : | |
| ADRIANA ROSA BAGATTIN, | : | |
| DANIELA PATRICIA GOLDMAN, | : | |
| MARIANO PABLO FERRARI, | : | |
| MARIANO GRACIARENA, and | : | |
| FERNANDO LOUREYRO, | : | |
| | : | |
| | : | |
| Defendants. | : | |

I, Ricky Sachar, pursuant to 28 U.S.C. §1746, declare as follows:

1.     I am over 18 years of age and an Assistant Director in the Division of Enforcement of the United States Securities and Exchange Commission ("Commission"). I have been employed by the Commission for nine years. My duties include supervising and conducting investigations into potential violations of the federal securities laws. In June 2013, the Division of Enforcement commenced a formal investigation involving trading in the shares of Biozoom Inc. (f/k/a Entertainment Art, Inc.), whose stock is traded on the OTC Bulletin Board.

**A. Biozoom, Inc. f/k/a Entertainment Art, Inc. Background**

2.      Biozoom, Inc. ("Biozoom") is a Nevada corporation.  Biozoom's common stock is registered with the Commission pursuant to Section 12 of the Securities Exchange Act of 1934 ("Exchange Act") [15 U.S.C. §78l] and is quoted on the OTCBB under the trading symbol "BIZM."  Until April 1, 2013, Biozoom was known as Entertainment Art, Inc. ("Entertainment Art").

3.      Entertainment Art represented itself as a developmental stage company formed to design, produce, and sell a line of leather bags, with offices located in West Hempstead, New York.  According to filings made by Entertainment Art with the Commission, beginning in late 2007, Entertainment Art sold some of its stock in private placements.  On July 18, 2008, Entertainment Art filed a Form S-1 registration statement with the Commission to register the resale transactions for the 34 shareholders who acquired Entertainment Art stock in these private placements.  In particular, of the total 1,810,000 shares outstanding at the time of the Form S-1, Entertainment Art's S-1 covered 610,000, or approximately one-third, of the company's then outstanding shares.

4.      The remaining 1,200,000 shares of Entertainment Art stock were held by the three officers of Entertainment Art (Joseph Koegel, Ian Beiss, and David Lubin) in three identical 400,000 share blocks.

5.      On May 1, 2009, Entertainment Art made a public filing that the three Entertainment Art officers sold their total 1,200,000 shares of Entertainment Art to Medford Financial Ltd. ("Medford Financial"), a Belizean entity, for a purchase price of $120,000.

6.      The Commission's staff, however, has uncovered evidence that Medford Financial purchased more than 1,200,000 shares of Entertainment Art.  In particular, Medford

Financial also purchased all of the 610,000 shares that were sold to the 34 shareholders identified in the company's July 18, 2008 Form S-1.   (*See* Declaration of David Lubin, filed contemporaneously herewith.)

      7.     All of the share certificates for the 34 shareholders were collected by David Lubin, who was then Entertainment Art's legal counsel and one of its officers.   Each of the 34 share certificates contained the requisite signature guarantees and other information to allow for them to be sold or transferred to Medford Financial.[1]

      8.     On June 30, 2009, Entertainment Art's board of directors approved the implementation of a 33:1 forward split for Entertainment Art stock without correspondingly increasing the authorized shares of common stock for Entertainment Art.   On July 21, 2009, the forward split went effective, and as a result of the forward split, the company had 59,730,000 shares of common stock outstanding.

**B.   Sale of Entertainment Art and Acquisition of Biozoom Technology**

      9.     On October 25, 2012, Entertainment Art announced that Medford Financial sold 39,600,000 common shares of Entertainment Art in a private transaction to Le Mond Capital for a purchase price of $430,000, or approximately $0.01 per share.   Entertainment Art disclosed that, as a result of the sale, Le Mond Capital controlled over 66.3% of the Company's issued and outstanding common stock.   In the stock purchase agreement reflecting this transaction, Sarah Deutsch ("Deutsch") signed on behalf of Le Mond Capital as "Purchaser."

---

[1]    Based on information obtained from Manhattan Transfer Registrar Co. ("Manhattan Transfer"), Entertainment Art's transfer agent based in Miller Park, New York, however, the stock certificates of the 34 shareholders were not presented to Manhattan Transfer with instructions that all of those certificates had been purchased by Medford Financial.

10.     Upon information and belief, however, Medford Financial owned all of the outstanding shares of Entertainment Art at this time (59,730,000 shares), and sold all of the outstanding shares to Le Mond Capital.[2]

11.     The stock certificates originally issued to the Entertainment Art private placement investors were provided to counsel for Sarah Deutsch and Le Mond Capital.

12.     As a result of this transaction, Entertainment Art announced Deutsch as the company's new President, Chief Executive Officer, Principal Executive Officer, Treasurer, Chief Financial Officer, Secretary, Treasurer, and Director.

13.     Entertainment Art public filings with the Commission indicate that from September 2011 to at least October 2012, Deutsch worked as manager of Magdalena's Party which, according to the website http://www.magdalenasparty.com, is a restaurant located in Buenos Aires, Argentina, where, upon information and belief, Deutsch resides.   Further, according to the website http://www.whatsupbuenosaires.com/goingout/Magdalena's_Party, Magdalena's Party is co-owned by Deutsch, Magdalena ("Magui") Tavella, and others.

14.     On March 12, 2013, Entertainment Art filed a Form 8-K with the Commission in which it announced a dramatic change in its business operations from a company that developed fashionable leather bags to a company that was involved in the biomedical industry.   In particular, Entertainment Art announced a transaction pursuant to which its newly formed subsidiary, Biozoom Technologies, Inc., acquired certain patents, licenses, and related assets from each of three separate companies: Opsolution Spectroscopic Systems, Opsolution NanoPhotonics, and Opsolution GmBH, (the "Opsolution acquisition") in exchange for cash of $50,000 and 39 million shares of Entertainment Art common stock.

---

[2]     As set forth herein, this assertion is based on the circumstantial evidence the Commission's staff has developed that we have concerning the connection between Deutsch and the brokerage accounts opened by the defendants.

15.     Entertainment Art described that, through Biozoom, it was now in the business of "researching, developing, and licensing technologies relating to the mobile remote collection of biomedical data as well as bilateral diagnostic communication."

16.     Entertainment Art further disclosed in the March 12, 2013 Form 8-K that, as a result of the Opsolution acquisition, it ceased being considered a "shell" company.

17.     Counsel for Biozoom has informed Commission staff that in connection with the Opsolution acquisition, Le Mond Capital returned 39,000,000 shares of Entertainment Art stock to the company and retained 600,000 shares of Entertainment Art bearing a restrictive legend. The 39,000,000 shares were subsequently allocated, and those shares were issued – as shares bearing a restrictive legend – to four entities associated with the Opsolution entities.

18.     Thus, after the Opsolution acquisition, the company's outstanding total stock was in two categories:  39,600,000 shares of shares bearing a restrictive legend and the 20,130,000 shares that were listed in the July 2008 Form S-1 for the 34 shareholders who acquired their Entertainment Art shares in private placements starting in 2007 – shares that were sold and relinquished to Medford Financial in May 2009.

19.     In the March 12, 2013 Form 8-K, Entertainment Art stated that – as of immediately after closing of the Opsolution acquisition – Deutsch stepped down as CEO and Chief Financial Officer of Entertainment Art, but stayed on as a Director only.

20.     On April 1, 2013, Entertainment Art changed its name to Biozoom, under the trading symbol "BIZM" on the OTC Bulletin Board.

**C. Accounts In the Names of Argentine Nationals Receive Biozoom Stock**

21.     From January 2013 to May 2013, brokerage accounts were opened at Legend Securities, Inc. ("Legend") a registered broker-dealer based in New York, New York, in the

name of four Argentine nationals:  Andres Horacio Ficicchia, Gonzalo Garcia Blaya, Luciana
Mariana Hernando, and Cecilia De Lorenzo.

22.    From May 2013 to June 2013, brokerage accounts were opened at Scottsdale
Capital Advisors, Inc. ("Scottsdale") a registered broker-dealer based in Phoenix, Arizona, in the
name of six Argentine nationals:  Magdalena Tavella, Adriana Rosa Bagattin, Daniela Patricia
Goldman, Mariano Pablo Ferrari, Mariano Graciarena, and Fernando Loureyro.

23.    According to the brokerage firms' account opening and due diligence
documentation, all of the accountholders reside in Buenos Aires, Argentina.  Moreover, all of the
accountholders had email addresses with domain names that had a very distinctive and similar
format that incorporated their actual names into the web address.  For example, Lucia Mariana
Hernando indicated that her email address was lucia@marianahernando.com.    Similarly,
Gonzalo Garcia Blaya indicated that his email address was gonzalo@garciablaya.com.    A
search of the domain names for each of the accountholders indicates that all of these domain
names were created in September 2012 and were registered with the same regional internet
registry.

24.    According to the brokerage firms' documentation, none of the Argentine
accountholders, with one exception, worked in fields unrelated to securities.  In particular, the
account documents for Ficicchia indicated that he was a self-employed "music producer"; the
account documents for Blaya indicated that he was a "music producer-stock investments"; the
account documents for Hernando indicated that she was a "Marketing Manager"; the account
documents for De Lorenzo indicated that she was a self-employed marketing specialist; and the
account documents for Tavella indicated that she was an attorney practicing "administrative,
political, intellectual property, and patent law."

25.     The account documents for Bagattin indicated that she was a "retired teacher"; the account documents for Ferrari indicated he worked in "sales and marketing"; the account documents for Loureyro indicated that he was an attorney practicing in the areas of tax, corporations, and business; the account documents for Graciarena indicated that he was an attorney practicing in the area of tax; and the account documents for Goldman indicated that she was an owner of a deli.

<u>Andres Horacio Ficicchia</u>

26.     Based on account opening documentation, Ficicchia opened his account at Legend on or about January 24, 2013 (account number ending in -FICICC) and funded the account with $26,000 cash.

27.     On November 30, 2012, Manhattan Transfer issued an Entertainment Art certificate for 165,000 shares to Ficicchia.

28.     On March 13, 2013, Manhattan Transfer issued an Entertainment Art certificate for 1,237,500 shares to Ficicchia.

29.     The certificate for 1,237,500 shares was accompanied by a corporate certification stating that Deutsch certified – at a board meeting of Entertainment Art on March 22, 2013 – that the company approved the issuance of that certificate to Ficicchia.

30.     In order to deposit the certificate for 1,237,500 shares and the certificate of 165,000 shares of Entertainment Art into his brokerage account at Legend, Ficicchia completed a "Deposit for Securities Request Certificate Questionnaire" that was required by Legend, and provided additional documentation.

31.     The documentation reflected that Ficicchia acquired the 1,237,500 shares pursuant to two private sales that were completed on February 19, 2013: (1) a purchase of

412,500 shares from Investor A and (2) a purchase of 825,000 shares from Investor B.[3]  The documentation also reflected that he paid a total of approximately $6,300 for these shares, which equals approximately $.005 per share.

32.     The documentation further reflected that Ficicchia acquired the 165,000 shares pursuant to a private sale that was completed on November 30, 2012 with Investor C – shares that he acquired for $24,750, which equals approximately $0.15 per share.

33.     In connection with the questionnaire, Ficicchia provided three separate stock purchase agreements that were purportedly signed by him and Investors A, B, and C, respectively.

34.     On March 5, 2013, Ficicchia deposited 165,000 shares of Entertainment Art not bearing a restrictive legend into his brokerage account at Legend; and then on March 27, 2013, Ficicchia deposited an additional 1,237,500 shares of Entertainment Art (again not bearing a restrictive legend) – for a total of 1,402,500 shares.  On April 1, 2013, due to the name change of Entertainment Art to Biozoom, these shares became Biozoom shares.

Gonzalo Garcia Blaya

35.     On or about March 26, 2013, Blaya opened an account at Legend (account number ending -KBLAYA) and funded the account with $26,000 cash.

36.     On March 22, 2013 –four days prior to opening this account – Manhattan Transfer issued a certificate for 1,485,000 Entertainment Art shares to Blaya.

37.     In order to deposit his certificate for 1,485,000 shares of Entertainment Art into his brokerage account at Legend, Blaya completed a "Deposit for Securities Request Certificate Questionnaire" that was required by Legend, and provided additional documentation.

---

[3]     Based on records obtained from Manhattan Transfer, Investor B is an entity based in Panama City, Panama.

38.     The documentation reflected that Blaya acquired the 1,485,000 shares in four separate private sales that were completed on March 4, 2013: (1) a purchase of 165,000 shares from Investor D; (2) a purchase of 495,000 shares from Investor E; (3) a purchase of 165,000 shares from Investor F; and (4) a purchase of 660,000 shares from Investor G.   The documentation reflected that he paid a total of approximately $6,765 for these shares, which equals approximately $.005 per share.

39.     In connection with the questionnaire, Blaya provided four stock purchase agreements that were purportedly signed by him and each of Investors D, E, F, and G, respectively.

40.     On April 16, 2013, Blaya deposited 1,485,000 shares of Entertainment Art not bearing a restrictive legend into his brokerage account at Legend.  As a result of the business name change on April 1, 2013, these shares became Biozoom shares.

<u>Luciana Mariana Hernando</u>

41.     On or about March 7, 2013, Hernando opened an account at Legend (account number ending in –RNANDO) and funded the account with $50,000 cash.

42.     On March 22, 2013, Manhattan Transfer issued a certificate for 1,815,000 Entertainment Art shares to Hernando.

43.     In order to deposit her 1,815,000 shares of Entertainment Art into her brokerage account at Legend, Hernando completed a "Deposit for Securities Request Certificate Questionnaire" that was required by Legend, and provided additional documentation.

44.     The documentation reflected that Hernando acquired the 1,815,000 shares pursuant to two separate private sales that were completed on March 5, 2013: (1) a purchase of 1,650,000 shares from Investor H; and (2) a purchase of 165,000 shares from Investor I.   The

documentation also reflected that Hernando paid a total of approximately $5,445 for these shares, which equals approximately $.003 per share.

45.    In connection with the questionnaire, Hernando provided two separate stock purchase agreements that were purportedly signed by her and each of the above persons, respectively.

46.    On May 14, 2013, Hernando deposited 1,815,000 shares of Entertainment Art not bearing a restrictive legend into her brokerage account at Legend.  As a result of the business name change on April 1, 2013, these shares became Biozoom shares.

Cecilia De Lorenzo

47.    On or about February 4, 2013, De Lorenzo opened an account at Legend (account ending in –ORENZO) and funded the account with $50,000 cash.

48.    On March 13, 2013, Manhattan Transfer issued a certificate for 2,062,500 shares to De Lorenzo.

49.    The certificate was accompanied by a corporate certification stating that Deutsch certified – at a board meeting of Entertainment Art on March 22, 2013 – that the company approved the issuance of the above certificate to De Lorenzo.

50.    In order to deposit her 2,062,500 shares of Entertainment Art into her brokerage account at Legend, De Lorenzo completed a "Deposit for Securities Request Certificate Questionnaire" that was required by Legend, and also provided additional documentation.

51.    The documentation reflected that De Lorenzo acquired the 2,062,500 shares pursuant to two separate private sales that were completed on February 19, 2013 – the same day as the purported purchases of Entertainment Art stock by Ficicchia: (1) a purchase of 1,650,000 shares from Investor J; and (2) a purchase of 412,500 shares from Investor K.    The

documentation also reflected that De Lorenzo paid a total of approximately $8,300 for these shares, which equals approximately $.004 per share.

52.     In connection with the questionnaire, De Lorenzo provided two separate stock purchase agreements for each of the transactions, signed by her and each of the above persons, respectively.

53.     On March 22, 2013, De Lorenzo deposited 2,062,500 shares of Entertainment Art not bearing a restrictive legend into her brokerage account at Legend.  As a result of the business name change on April 1, 2013, these shares became Biozoom shares.

Magdalena Tavella

54.     On or about May 16, 2013, Tavella opened an account at Scottsdale (account number ending in 13831).

55.     On March 22, 2013, Manhattan Transfer issued a certificate for 1,815,000 shares of Entertainment Art to Tavella.

56.     In order to deposit her 1,815,000 shares of Entertainment Art into her brokerage account, Scottsdale, using information and documentation provided by Tavella, completed a securities deposit checklist.

57.     The documentation reflected that Tavella acquired the 1,815,000 shares pursuant to three separate private sales that were completed on March 5, 2013 – the same day as the purported purchases of Entertainment Art by Hernando: (1) a purchase of 165,000 shares from Investor L; (2) a purchase of 165,000 shares from Investor M; and (3) a purchase of 1,485,000 shares from Investor N.  The documentation reflected that Tavella paid a total of approximately $9,075 for these shares, which equals approximately $.006 per share.

58.    In connection with the checklist, Tavella provided three separate stock purchase agreements that were purportedly signed by her and each of the above persons, respectively.

59.    In a letter dated May 17, 2013 to Scottsdale, Deutsch represented and certified that Tavella had acquired her shares from Investors L, M, and N.  In a letter dated May 20, 2013 to Scottsdale, Tavella made various representations concerning her deposit of 1,815,000 shares of Entertainment Art into her account.  For example, Tavella represented that she was not "acting in concert" with others to exercise control of the company or to dispose of company securities.

60.    On May 22, 2013, Tavella deposited 1,815,000 shares of Entertainment Art not bearing a restrictive legend into her brokerage account at Scottsdale.  As a result of the business name change on April 1, 2013, these shares became Biozoom shares.

<u>Adriana Rosa Bagattin</u>

61.    On or about May 10, 2013, Bagattin opened an account at Scottsdale (account number ending in 15345).

62.    On March 13, 2013, Manhattan Transfer issued a certificate for 2,310,000 Entertainment Art shares to Bagattin.

63.    In order to deposit her 2,310,000 shares of Entertainment Art into her brokerage account, Scottsdale, using information and documentation provided by Bagattin, completed a securities deposit checklist.

64.    The documentation reflected that Bagattin acquired the 2,310,000 shares pursuant to three private sales that were completed on February 26, 2013:  (1) a purchase of 1,650,000 shares from Investor O; (2) a purchase of 330,000 shares from Investor P; and (3) a purchase of 330,000 shares from Investor Q.  The documentation further reflected that Bagattin paid approximately $6,930 for these shares, which equals approximately $.003 per share.

65.     In connection with the checklist, Bagattin provided three separate stock purchase agreements that were purportedly signed by her and Investors O, P, and Q, respectively.

66.     In a letter dated May 17, 2013 to Scottsdale, Deutsch represented and certified that Bagattin had acquired her shares from Investors O, P, and Q.  In a letter dated May 20, 2013 to Scottsdale, Bagattin made various representations concerning her deposit of 2,310,000 shares of Entertainment Art into her account.  For example, Bagattin represented that she was not "acting in concert" with others to exercise control of the company or to dispose of company securities.

67.     On May 22, 2013, Bagattin deposited 2,310,000 shares of Entertainment Art not bearing a restrictive legend into her brokerage account at Scottsdale.  As a result of the business name change on April 1, 2013, these shares became Biozoom shares.

Daniela Patricia Goldman

68.     On or about May 13, 2013, Goldman opened an account at Scottsdale (account number ending in 43536).

69.     On March 22, 2013, Manhattan Transfer issued a certificate for 2,485,000 Entertainment Art shares to Goldman.

70.     In order to deposit her 2,485,000 shares of Entertainment Art into her brokerage account, Scottsdale, using documentation and information provided by Goldman, completed a securities deposit checklist.

71.     The documentation reflected that Goldman acquired the 2,485,000 shares pursuant to two private sales that were completed on March 4, 2013:  (1) a purchase of 1,485,000 shares from Investor R; and (2) a purchase of 1,000,000 shares from Investor S.   The

documentation further reflected that Goldman paid approximately $7,455 for these shares, which equals approximately $.003 per share.

72.     In connection with the checklist, Goldman provided two separate stock purchase agreements that were purportedly signed by her and Investor R and Investor S, respectively.

73.     In a letter dated May 17, 2013 to Scottsdale, Deutsch represented and certified that Goldman had acquired her shares from Investors R and S. In a letter dated May 20, 2013 to Scottsdale, Goldman made various representations concerning her deposit of 2,485,000 shares of Entertainment Art into her account. For example, Goldman represented that she was not "acting in concert" with others to exercise control of the company or to dispose of company securities.

74.     On May 22, 2013, Goldman deposited 2,485,000 shares of Entertainment Art not bearing a restrictive legend into her brokerage account at Scottsdale. As a result of the business name change on April 1, 2013, these shares became Biozoom shares.

<u>Mariano Pablo Ferrari</u>

75.     On or about May 20, 2013, Ferrari opened an account at Scottsdale (account number ending in 55327).

76.     On March 22, 2013, Manhattan Transfer issued a certificate for 2,310,000 Entertainment Art shares to Ferrari.

77.     In order to deposit his 2,310,000 shares of Entertainment Art into his brokerage account, Scottsdale, using documentation and information provided by Ferrari, completed a securities deposit checklist.

78.     The documentation reflected that Ferrari acquired the 2,310,000 shares pursuant to two private sales that were completed on March 5, 2013: (1) a purchase of 1,650,000 shares from Investor T; and (2) a purchase of 660,000 shares from Investor U. The documentation

further reflected that Ferrari paid approximately $9,240 for these shares, which equals approximately $.004 per share.

79. In connection with the checklist, Ferrari provided two separate stock purchase agreements that were purportedly signed by him and Investor T and U, respectively.[4]

80. In a letter dated May 17, 2013 to Scottsdale, Deutsch represented and certified that Ferrari had acquired his shares from Investors T and U. In a letter dated May 20, 2013 to Scottsdale, Ferrari made various representations concerning his deposit of 2,310,000 shares of Entertainment Art into her account. For example, Ferrari represented that she was not "acting in concert" with others to exercise control of the company or to dispose of company securities.

81. On May 22, 2013, Ferrari deposited 2,310,000 shares of Entertainment Art not bearing a restrictive legend into his brokerage account at Scottsdale. As a result of the business name change on April 1, 2013, these shares became Biozoom shares.

Two Other Accounts in Names of Argentine Nationals

82. On or about June 14, 2013, Fernando Loureyro opened an account at Scottsdale (account number ending in 77518). On or about June 14, 2013, Mariano Graciarena opened an account at Scottsdale (account number ending in 38720). Like the other eight accountholders, both stated in brokerage firm documents that they resided in Buenos Aires, Argentina.

83. On March 22, 2013, Manhattan Transfer issued a certificate for 2,145,000 Entertainment Art shares to Graciarena and a certificate for 2,300,000 Entertainment Art shares to Loureyro.

---

[4]     As part of their documentation to deposit their Entertainment Art shares, each account holder submitted nearly identical attorney opinion letters stating that the shares deposited into their brokerage accounts qualified for various safe-harbors or statutory exemptions such that their shares could be issued without a restrictive legend. Accountholders Tavella, Ficicchia, Blaya, Hernando, De Lorenzo, Goldman, Ferrari, Bagattin, Graciarena, and Loureyro submitted letters from Randall S. Goulding, Esq. and accountholders Tavella and Goldman submitted letters from David Wise, Esq. Both Mr. Goulding and Mr. Wise have withdrawn their opinion letters for all accountholders.

84.     Graciarena presented documentation to Scottsdale reflecting that he acquired his 2,145,000 shares in four separate private sales on March 4, 2013: (1) a purchase of 165,000 shares from Investor V; (2) a purchase of 165,000 shares from Investor W; (3) a purchase of 165,000 shares from Investor X; and (4) a purchase of 1,650,000 shares from Investor Y.  The documentation further reflected that Graciarena obtained his shares for approximately $6,435, which equals approximately $.003 per share.  Graciarena also presented four separate stock purchase agreements that were purportedly signed by him and Investors V, W, X, and Y, respectively, persons identified whose shares were registered for resale transactions in the July 2008 Form S-1.

85.     On June 18, 2013, Graciarena deposited 2,145,000 shares of Entertainment Art not bearing a restrictive legend into his brokerage account at Scottsdale.  As a result of the business name change on April 1, 2013, these shares became Biozoom shares.

86.     Like Graciarena and the other accountholders at Scottsdale, Loureyro presented documentation to Scottsdale reflecting that he acquired his 2,300,000 shares in a private sale on March 4, 2013 with Investor S.  The documentation further reflected that Loureyro obtained his shares for approximately $9,200, which equals approximately $.004 per share.  Loureyro also presented a stock purchase agreement that was purportedly signed by him and Investor S, an individual whose shares were registered for resale transactions in the July 2008 Form S-1.

87.     On June 18, 2013, Loureyro deposited 2,300,000 shares of Entertainment Art not bearing a restrictive legend into his brokerage account at Scottsdale.  As a result of the business name change on April 1, 2013, these shares became Biozoom shares.

88.     Thus, from November 2012 to June 2013, ten accounts in the name of Argentine nationals received a total of 20,130,000 shares of Entertainment Art.  These shares represented

100% percent of the total shares without a restrictive legend outstanding in Biozoom at the time, and approximately 33% percent of the total outstanding shares of Biozoom.

**D. Biozoom Promotional Campaign and Dramatic Increase in Stock Price and Volume**

89. Beginning on May 22, 2013 – and after almost all of the account holders named above had deposited their Biozoom shares (without bearing a restrictive legend) into their accounts – Biozoom began issuing a series of press releases in which it claimed it "created the world's first portable, handheld consumer device" to instantly and non-invasively measure certain biomarkers. According to the press releases, "[w]ith a simple click of a button, the Biozoom scanner reflects a beam of light off the skin" and "instantly and non-invasively measures certain biomarkers," such as antioxidant levels, vitamin absorption, stress responses, oxygen consumption and other factors to help improve wellness and physical performance, and then sends the results "instantly" to a smart phone or online account.

90. These claims were also made by other entities, including Global Investors Research, LLP, Stock Preacher.com, among others. For example, on May 16, 2013, The Stock Report published a 24-page research report touting investment in Biozoom stock. The Stock Report claimed that Biozoom was "a leader in developing, patenting, and licensing premiere technology in the space" and that GNC, Nutilite, CVS, Walgreens, P&G and Walmart were "some of the companies that the firm may target for the launch of the device." The Stock Report concluded that Biozoom stock, which at the time was trading at $1.10 per share, would yield a 12-month price target of $10.30 a share.

91. Global Financial Insight, an affiliate of The Stock Report, issued a separate research report on Biozoom. The report claimed that the Biozoom scanner was "the only handheld diagnostic device of its kind worldwide that tests for your health WITHOUT blood

tests or piercing the skin." On June 23, 2013, Global Financial Insight placed a full-page advertisement which ran in the Business Section of the Sunday New York Times. This advertisement was an abbreviated version of Global Financial's earlier research report.

92.     Following the press releases and the above-described reports, Biozoom's stock and volume rose dramatically. In particular, on May 16, 2013, Biozoom's stock price was $1.10 per share – but in just one month's time, Biozoom's stock price rose to over $4 per share and currently trades at approximately $3 per share.

93.     Prior to May 16, 2013, there were no Biozoom shares traded. However, between May 16 and June 21, 2013, a total of 87,936,300 Biozoom shares traded. The daily trading volume in Biozoom shares increased from 10,000 shares on May 16, 2013, to a high of 11,657,600 shares on June 11, 2013.

**E. Large Biozoom Sales By Accounts in The Names of Eight Argentine Nationals**

94.     As Biozoom's stock price and volume rose dramatically, the accounts in the name of eight of the Argentine Nationals sold substantial amounts of their Biozoom stock that did not bear a restrictive legend for large profits. In particular, and as reflected in the chart below, the accounts sold 14,078,406 shares of BIZM stock for proceeds of almost $34 million ($33,957,152).

| Argentine National | Shares Sold | Dates Sold | Proceeds | Shares Remaining |
|---|---|---|---|---|
| Blaya | 1,312,053 | 5/16/13 – 6/13/13 | $3,070,251 | 172,947 |
| De Lorenzo | 1,328,000 | 6/17/13 – 6/18/13 | $5,020,550 | 734,500 |
| Hernando | 1,815,000 | 6/6/13 – 6/17/13 | $5,269,030 | 0 |
| Ficcichia | 1,402,500 | 5/20/13 – 6/5/13 | $2,068,666 | 272,620[5] |
| Tavella | 1,592,444 | 6/7/13 – 6/11/13 | $3,116,894 | 382,956[6] |

---

[5]     On or around June 10, 2013, Ficicchia opened an account at Scottsdale and funded this account with $1 million from his account at Legend. Ficicchia's "Shares Remaining" column reflects Biozoom purchases that he has made in his account at Scottsdale.

| Argentine National | Shares Sold | Dates Sold | Proceeds | Shares Remaining |
|---|---|---|---|---|
| Bagattin | 2,176,726 | 6/10/13 – 6/18/13 | $6,223,310 | 133,724 |
| Ferrari | 1,994,038 | 6/7/13 – 6/19/13 | $5,456,690 | 315,962 |
| Goldman | 2,457,645 | 5/28/13 – 6/6/13 | $3,771,761 | 27,355 |
| Total | 14,078,406 | 5/16/13 – 6/19/13 | $33,997,152 | 1,384,488 |

95.     There was no registration statement in effect for the Biozoom stock sale transactions by the Argentine accountholders.  Further, there is no registration statement in effect concerning any sale transactions for Biozoom securities.

96.     All of the accounts in the names of the selling Argentine Nationals placed their orders to sell Biozoom stock in the same manner – via e-mail and instant message to Legend and Scottsdale.  These accounts have not traded in any securities other than BIZM.

97.     Upon selling shares in Biozoom, several of the accountholders instructed their registered broker-dealer (Legend and Scottsdale) to wire the proceeds of their sales to foreign bank accounts in various countries:

- **Ficicchia**: On June 7, 2013, defendant Ficicchia instructed Legend, to wire $1 million to Alpine Securities, Inc., a registered clearing broker-dealer.  Alpine provides clearing services for Scottsdale, and as described earlier, Ficicchia opened an account at Scottsdale on or around June 10, 2013 and funded it with this $1 million.  On June 25, 2013 – the same day as the Commission's order suspending trading in Biozoom – Ficicchia instructed Scottsdale to wire $325,000 to a bank account in Cyprus.  This wire was not executed.  Ficicchia's brokerage account at Legend currently has a cash balance of slightly over $1 million, and Ficicchia's brokerage account at Scottsdale currently has a cash balance of approximately $328,000.

---

[6]     Tavella's "Shares Remaining" column includes 160,400 Biozoom shares that she purchased in the open market on June 19, 2013.

- **Blaya**: On June 14, 2013, Blaya instructed his broker-dealer, Legend, to wire "all settled funds except $30,000" to an account held at CBH Compagnie Bancaire Helvetique SA in Geneva, Switzerland.  This wire was not executed.  This account currently has a cash balance of approximately $3 million.

- **Hernando**:  On June 13, 2013, Hernando instructed her broker-dealer, Legend, to wire "all available settled cash" in her account, which at the time, was approximately $600,000, to an account held at Hellenic Bank Public Company Limited in Lemesos, Cyprus.  This wire was executed.  On June 17, 2013, Hernando instructed her broker-dealer, Legend, to wire $2 million, again to an account held at Hellenic Bank Public Company Limited in Lemesos, Cyprus.  This wire was not executed by Legend.  This account has a cash balance of approximately $4.5 million.

- **De Lorenzo**:  De Lorenzo has not yet attempted to wire any money out of her account.  De Lorenzo has a bank account at FBME Bank, Ltd. in Dar es Salaam.  The account has a cash balance of approximately $4.8 million.

- **Tavella**:  On June 25, 2013 – the day of the Commission's order suspending trading in the securities of Biozoom – Tavella attempted to wire approximately $2,450,000 out of her account at Scottsdale to a bank account at Loyal Bank in St. Vincent and the Grenadines.  This wire has not been executed by Scottsdale.  The current cash balance in Tavella's brokerage account is approximately $2.47 million.

- **Bagattin**:  On June 20, 2013, Bagattin instructed Scottsdale to wire approximately $4.33 million to an account held at FBME Bank Limited in Cyprus.  This wire was executed.  On June 24, 2013, Bagattin instructed Scottsdale to send an additional approximately

$1.89 million to the same bank account.  This wire was also executed.  The current cash balance in Bagattin's brokerage account is $3,000.

- **Goldman:**  On June 11, 2013, Goldman instructed Scottsdale to wire approximately $3.77 million to an account held at CBH Compagnie Bancaire Helvetique SA in Geneva, Switzerland – a bank where Blaya also holds an account.  This wire was executed.  The cash balance in Goldman's account is $0.

- **Ferrari:**  On June 19, 2013, Ferrari instructed Scottsdale to wire $500,000 to an account held at HSBC Bank in Panama.  This wire was executed.  On June 24, 2013, Ferrari instructed Scottsdale to send an additional $4.9 million, this time to Choice Bank Limited in Belize.  This wire was also executed.  The cash balance in Ferrari's account is $0.

98.    Thus, $16,989,390.92 in proceeds from the sale of Biozoom stock has been wired outside of the United States.  $15,751,501 in cash from the Biozoom stock sale proceeds remain in the Argentine account-holders' brokerage accounts along with 1,384,488 shares of Biozoom stock.  However, defendants have already instructed their brokers to wire $7,712,671.37 of these proceeds to foreign bank accounts.

99.    On June 25, 2013, as a result of its preliminary investigation into suspicious trading activity in Biozoom stock, the Commission issued a ten business day trading suspension in Biozoom stock.

**F.  Evidence That Accounts Used False Stock Purchase Agreements**

100.    Accountholders for each of the ten accounts submitted documentation reflecting that they had acquired their shares from persons who had purchased Entertainment Art stock in the private placements beginning in late 2007 – whose shares were subsequently registered for resale pursuant to Entertainment Art's July 18, 2008 Form S-1.  The accountholders provided

stock purchase agreements that they had purportedly signed with each of the identified sellers of Entertainment Art stock.

101.   The Commission has uncovered evidence demonstrating that the accountholders did not obtain their Entertainment Art shares in the above-described manner, and that they did so through false stock purchase agreements.

<u>Andres Horacio Ficicchia</u>

102.   Ficicchia represented that he acquired his 1,237,500 shares from two private transactions with Investor A and Investor B.  Ficicchia represented that he obtained 412,500 shares from Investor A and 825,000 shares from Investor B – both on February 19, 2013. Ficicchia also represented that he acquired an additional 165,000 shares from a private transaction with Investor C.  Ficicchia provided stock purchase agreements purportedly signed by him and the sellers.

103.   Investor A's wife has informed the Staff that both she and her husband had previously invested in Entertainment Art years ago, and had not thought of that investment in a "long time."  This is not consistent with Ficicchia's claim that he purchased Entertainment Art shares from Investor A in February 2013 – just four months ago.

<u>Gonzalo Garcia Blaya</u>

104.   Gonzalo Garcia Blaya represented that he acquired his 1,485,000 shares in four private transactions:  165,000 shares purchased from Investor D; 495,000 shares purchased from Investor E; 165,000 shares purchased from Investor F; and 660,000 shares purchased from Investor G.

105.   Investor F has informed the Staff that, sometime in 2007 or 2008, she provided approximately $1,000 to a family friend for an investment that she believed was in Entertainment

Art – the family friend's company.  Investor F informed us that, about one year after providing this $1,000, she received her money back with a slight return.

106.    Investor F said that she never sold any Entertainment Art shares to Gonzalo Garcia Blaya, and had never heard of that person before.  In addition, Investor F said that she never signed any stock purchase agreement with Gonzalo Garcia Blaya.

107.    Investor F – along with her brother – confirmed that Investor E – a person from whom Blaya claimed to have purchased 495,000 shares of Entertainment Art – was their mother.  Both Investor F and Investor F's brother informed the Staff that Investor E died in 2010 – approximately three years before Blaya's claimed purchase of Entertainment Art stock from her.

108.    Blaya also represented that he purchased 660,000 shares from Investor G.  Investor G informed us that – he and his wife – had invested a small amount of money in 2008 with a friend associated with Entertainment Art; and had sold their shares of Entertainment Art years ago.  Investor G said that he never sold 660,000 shares of Entertainment Art shares to Gonzalo Garcia Blaya.    Investor G further said that he never signed any stock purchase agreement to sell Entertainment Art shares to Gonzalo Garcia Blaya.

Luciana Mariana Hernando

109.    Luciana Mariana Hernando represented that she acquired her 1,815,000 shares in two private transactions:   1,650,000 shares purchased from Investor I and 165,000 shares purchased from Investor J.  Hernando provided stock purchase agreements purportedly signed by her and the sellers.

110.    Investor I informed us that, sometime in 2007, he recalled giving $5,000 a friend, who was then Entertainment Art's CEO, for an investment in a company.  Investor I vaguely recalled that this company was Entertainment Art.  Investor I informed the Staff that, soon after

his investment, his friend gave him his full $5,000 back with a very small return. Investor I said he had never met or heard of Luciana Mariana Hernando and never sold his Entertainment Art shares to Luciana Mariana Hernando.

Cecilia De Lorenzo

111. Cecilia De Lorenzo represented that she acquired her 2,062,500 shares in two private transactions: 1,650,000 shares purchased from Investor J and 412,500 shares purchased from Investor K. De Lorenzo provided stock purchase agreements purportedly signed by her and the sellers.

112. Investor J informed the Staff that, in approximately 2008, he loaned approximately $5,000 to his friend, who needed the money to start a business. Investor J said that, in exchange for providing the $5,000 loan, he received shares, and believes that the shares were in a company called Entertainment Art. Investor J said that the loan he made to his friend was paid back in approximately 2009.

113. Investor J said that he did not sign a stock purchase agreement to sell his shares to Cecelia De Lorenzo—the individual who claimed to have purchased her shares from Investor J.

114. Investor K has informed the Staff that both she and her husband had previously invested in Entertainment Art years ago, and had not thought of that investment in a "long time." This is not consistent with De Lorenzo's claim that she purchased Entertainment Art shares from Investor K on February 19, 2013 – approximately four months ago.

Magdalena Tavella

115. Magdalena Tavella represented that she acquired her 1,815,000 shares in three private transactions on March 5, 2013: 165,000 shares purchased from Investor L, 165,000 shares purchased from Investor M, and 1,485,000 purchased from Investor N.

116.    Investor L informed the Staff that, many years ago, he made an investment with a friend in a company that he believed was Entertainment Art.  He said that he believed he made a small investment, and soon after his investment, received his money back from his friend.

117.    Investor L informed us, contrary to the stock purchase agreement with Tavella, he never had heard of her and that he never signed a stock purchase agreement with Tavella to sell her any shares of Entertainment Art.

118.    Moreover, as noted above, all ten accountholders submitted documentation reflecting that they purchased their shares from the 34 shareholders whose shares were registered for resale transactions in the July 2008 Form S-1 (or from persons who had acquired their shares from one of those 34 shareholders).   According to Entertainment Art's legal counsel at the time, however, the shares of all of those 34 shareholders were sold to Medford Financial in connection with Medford Financial's purchase of the company in May 2009 – almost <u>four years</u> before the claimed sale of these shares to the Argentine nationals.

### G.  Withdrawal of Legal Opinions Provided to Argentine Nationals

119.    In order to deposit their Entertainment Art share certificates in their brokerage accounts, each accountholder submitted legal opinions issued by Randall Goulding in which he opined that the share certificates for each of the accountholders could be received without bearing a restrictive legend based on an exemption from registration provided by Securities Act Rule 144.

120.    Goulding opined that the six-month holding period of Rule 144(d) was met because the accountholders were not affiliates of the company and they acquired the shares from persons who held the shares more than four years.   Goulding further opined that the accountholders were not, "individually or collectively" the beneficial owner of more than 10% of

the common shares of the Company and the share issuance was "not in connection with the distribution of any securities on . . .and the Holder is not an underwriter with respect to the Shares."

121.  These accounts, however, have many similarities:  they were each opened in the name of an Argentine national who purports to reside in Buenos Aires, Argentina; each represented that they had purchased their shares between February 19, 2013 and March 5, 2013 from persons who had acquired their shares from years ago (all of them claimed to have acquired shares from one or more of the original Form S-1 shareholders); each used email addresses that where the domain name was their last name and were created in September 2012 and opened with the same regional internet registry; each traded their Biozoom securities between May 16, 2013 and June 17, 2013 and traded no other securities; and, to the extent they traded, each accountholder placed their trades through instant messaging or email.

122.  Moreover, and as described above, the Commission's staff has uncovered evidence that each of the accountholders did not purchase their shares in the manner reflected in the documentation they provided.[7]

123.  On June 19, 2013, Goulding emailed the General Counsel of Legend and wrote "[a]s discussed, I hereby withdraw all of my opinions issued for the securities of Biozoom, Inc., formerly Entertainment Art, Inc., a Listed OTCBB company, symbols BIZM.  Be advised that none of these opinions should be relied upon.  I will also notify the issuer as well as other broker-dealers that I am aware of who may be relying upon these opinions." (See Exhibit A hereto).

124.  On May 20, 2013, attorney David Wise provided a similar legal opinion letter to Scottsdale for the accounts of Tavella and Goldman.  On June 26, 2013, Wise sent an email to

---

[7]      David Lubin, a former director and legal counsel for Entertainment Art, swore that all shareholders relinquished and sold their shares in Entertainment Art to Medford Financial in May 2009.  See David Lubin Declaration filed simultaneously herewith.

representatives of Scottsdale and Manhattan Transfer in which he wrote: "On May 20, 2013, this firm issued legal opinions for [Magdalena Tavella and Daniela Goldman].  It has been brought to our attention that the SEC recently suspended trading in the shares of Biozoom, Inc.  It has also been brought to our attention that [Magdalena Tavella and Daniela Goldman] may have provided inaccurate or misleading information and documentation to Scottsdale Capital Advisors and to this firm in connection with the requests for this firm's legal opinions.  Therefore, we hereby withdraw our legal opinions on the subject persons and their proposed sales of Biozoom, Inc. securities." (See Exhibit B hereto).

I declare under penalty of perjury that the foregoing is true and correct.

Executed on July  2 , 2013
Washington, DC

Ricky Sachar
Assistant Director, Division of Enforcement
U.S. Securities and Exchange Commission