# Exhibit 18



## ALPINE SECURITIES
*Stock Brokerage & Investment Company*

### Deposited Securities Request Form

| Indicate Type: | ☒ Physical Certificate Deposit | ☐ DWAC Transfer from Issuer | ☐ Other Transfer: | |
|---|---|---|---|---|
| Security Owner's Name: Magdalena Tavella | | | Account # | |

**Security Description:**

| Issuer/Company Name: Biozoom, Inc. | | Symbol: BIZM | |
|---|---|---|---|
| # of Shares: 1,815,000 | Cert. #1114 | Date Issued: 03/22/2013 | |
| Shares Outstanding: 59,730,000 | | Current Public Float: 20,130,000 | |
| Average Volume (last 3 mos.): | | Market Value: | |

**Security Owner Questions:**

| # | Question | Answer |
|---|---|---|
| 1 | Security Deposit Reason (e.g., safekeeping/resale): | resale |
| 2 | Date Owner acquired the Security: | 03/05/2013 |
| 3 | Describe the consideration paid for the Security. (For example, the amount of cash paid or the services rendered) | Amount or Description: $9,075 cash |
| 4 | Name of person/entity from whom Security was acquired: | J. Mansbach, D. McKelvey & Y. Muskin |
| 5 | Has Owner made any payment to any other person in connection with the proposed resale of the Security? | ☒ No ☐ Yes \| Explain: |
| 6 | Has Owner solicited or made any arrangement for the solicitation of buy orders in connection with the proposed resale of the Security? | ☒ No ☐ Yes \| Explain: |
| 7 | Is the issuer a shell company or has it been a shell company at any time during the last twelve months? | ☒ No ☐ Yes |
| 8 | Was the Security covered by a current registration statement when acquired? If yes, state registration filing date. | ☐ No ☒ Yes \| Filing Date: 07/29/2008 |
| 9 | Was Security purchased through a transaction exempt from registration? Describe exemption relied upon (e.g, a private offering exemption). | ☒ No ☐ Yes \| Exemption: |
| 10 | Is the Security restricted from resale for any reason? | ☒ No ☐ Yes \| Restriction: |
| 11 | Is the Security free-trading with no resale restrictions? If so, how have you verified its free-trading status? | ☐ No ☒ Yes \| Free-Trading Basis: transfer agent |
| 12 | Are you claiming a resale exemption? If so, which exemption? (For example, do you plan to rely on Rule 144?) | ☒ No ☐ Yes \| Exemption: |
| 13 | How many shares of the Issuer are owned or controlled, directly or indirectly, by Owner? (This includes, for example, shares owned by any company for which you are a principal or control person.) | Amount: 1,815,000 |
| 14 | Is Owner or has Owner ever been an officer, director, affiliate, control person or 5% owner of the issuer? (If yes, provide position, dates held, and the position's duties.) | ☒ No ☐ Yes \| Explain: |
| 15 | Has Owner or any affiliates of Owner sold any shares of the same class of securities in the last three months? (If yes, indicate the amount sold.) | ☒ No ☐ Yes \| Amount: |
| 16 | Does Owner intend to sell additional shares of the same class of securities through other means? | ☒ No ☐ Yes \| Explain: |
| 17 | If relying on Rule 144 for resale, describe below the complete history of the Security during the last 6 months, including each prior seller's name, purchase date, consideration paid, and affiliate status: | See attached |

1 of 2                                                                                     Revised 8/30/2012

SEC-Scottsdale-E-0004408

**Security Depositor Agreement**

By signing below and submitting the Deposited Securities Request Form (the Questionnaire) along with this Security Depositor Agreement (the Agreement) to Alpine Securities Corporation (Alpine), the security owner and/or account holder (the Security Depositor) depositing the above-listed security (the Security) acknowledges and agrees to each of the following:

1. **Updates.** The Security Depositor agrees to keep the foregoing Questionnaire information up to date and current with Alpine as long as the Security shares are kept in an account cleared by Alpine.

2. **Indemnification.** The Security Depositor agrees to indemnify and hold Alpine harmless from and against any and all public and private claims, regulatory actions, damages, liabilities, costs, and expenses which Alpine incurs as a result of or in connection with any inaccuracy, any misleading statement, or any omission in the Depositor's responses to the Questionnaire, including paying any and all of Alpine's attorney fees and costs related thereto. As part of this Indemnification, the Depositor agrees to pay, on a monthly basis or as requested by Alpine's attorneys, all of Alpine's attorney fees that are related to either the Security, the Questionnaire, or the Depositor, or to any combination of the three.

3. **Clearing Firm.** The Security Depositor acknowledges that if his/her/it's broker is not an Alpine broker then in accepting the Security, Alpine is acting merely as a carrying or clearing firm and performs only ministerial duties with regard to the above Security. Those duties may include receipt and delivery of funds, preparation and transmission of confirmations, maintenance of records, and collection of fees. As a clearing firm, Alpine is not acting as an adviser or fiduciary to the introducing broker's client, does not accept or execute orders, and does not assert any material control over the introducing broker's business.

4. **Cooperation with Information Requests.** The Security Depositor agrees to cooperate with any internal or external audit or regulatory inquiry relating to either the Questionnaire, the Security, or both by providing any information or documentation reasonably requested by Alpine to support the information provided in the Questionnaire and to ensure any sale of the Security complies with the Securities Laws (as defined below).

5. **Market Fluctuations.** Alpine is not responsible for any fluctuations in the market price of the Security during the clearing period, including any time after the Security Depositor submits the Security, submits the Questionnaire, or signs the Agreement. The Security Depositor acknowledges that the clearing process might take a substantial amount of time and agrees to hold Alpine harmless for, and waive any and all claims relating to, any loss in market value of the Security that occurs during the clearing period.

6. **Physical Certificates.** The Security Depositor agrees that in the event of an account transfer to an outside firm any stock deposits sent to Alpine in physical form will be returned to the address of record on the account in physical form. Returning stock in physical form may incur substantial fees; these fees are the responsibility of the Security Depositor. Alpine will not return the stock until all of these fees are paid. The Security Depositor acknowledges that the process of returning physical certificates might take a substantial amount of time and agrees to hold Alpine harmless for, and waive any and all claims relating to, any loss in market value of the Security that occurs during that period. If Security Depositor has a pre-existing written agreement as to account transfers and physical certificates with their brokerage firm, that agreement may supersede this provision.

7. **Non-DTC Eligible Securities.** Due to their labor-intensive and high-risk nature, Alpine has a unique policy for non-DTC eligible securities. First, Alpine charges $1,000 per deposit of non-DTC eligible securities. Second, Alpine charges the customer all transfer, delivery, or other fees that are required to settle trades. Third, Alpine will not disburse any proceeds from the sale of non-DTC eligible securities until thirty (30) days after the trade settlement day. Fourth, if, for any reason, Alpine fails to deliver and the buyer's firm initiates a buy-in or close-out procedure, Alpine will pass on any resulting fees to the account holder. If you have any questions, please discuss them with your broker and ensure you thoroughly understand this policy before you send Alpine any certificates or initiate any deposits in non-DTC eligible securities.

8. **Adherence to the Securities Laws.** The acceptance of any deposit of the Security or related securities is expressly subject to the Security Depositor's strict adherence to all applicable securities laws (the Securities Laws), including, but not limited to:

    a. **Selling Unregistered Securities:** Federal securities law makes it unlawful for any person to make use of any means or instrument of interstate commerce or of the mails to sell a security which has not been registered, or to deliver through the mail a security which has not been registered. Accordingly, unless a person or entity can apply for an exemption to its sales of securities, all securities sold are required to be registered pursuant to Section 5 of the Securities Act of 1933 (the 1933 Act);

    b. **Securities Fraud:** Federal securities law makes it unlawful for any person to offer or sell any securities by the use of any means of interstate communication or transportation, including the mails, in order to employ a scheme to defraud, to obtain money by omitting material information, or to engage in a course of business that would operate as a fraud on the purchaser;

    c. **Insider Trading:** Federal securities law prohibits insider trading, which generally refers to buying or selling a security, in breach of a fiduciary duty or other relationship of trust and confidence, while in possession of material, nonpublic information about the security. Insider trading violations may also include "tipping" such information, security trading by the person "tipped," and securities trading by those who misappropriate such information;

d. **Market Manipulation:** Market manipulation describes a deliberate attempt to interfere with the free and fair operation of the market and create artificial, false or misleading appearances with respect to the price of, or market for, a security, commodity or currency. Market manipulation is prohibited under federal securities laws; and

e. **Anti-Money Laundering:** The Bank Secrecy Act (BSA), and its implementing regulations, is a tool the U.S. Government uses to fight drug trafficking, money laundering, and other crimes. Congress enacted the BSA to prevent banks and other financial service providers from being used as intermediaries for, or to hide the transfer or deposit of money derived from, criminal activity. Federal law makes money laundering a criminal act. Money laundering is the criminal practice of filtering ill-gotten gains or "dirty" money through a maze or series of transactions, so the funds are "cleaned" to look like proceeds from legal activities.

Additionally, the Security Depositor represents and warrants that the information provided in the Questionnaire is true and correct, and acknowledges that Alpine will rely on the above information in determining whether to accept requests for the deposit of the Security. If the Security Depositor is unsure of or does not understand any items discussed either in the Questionnaire or in the Agreement, the Security Depositor should seek the advice of independent counsel. In order for Alpine to accept any deposit of any security, the Security Depositor agrees to all of the above terms of this Agreement.

| Signature of the Security Depositor or of Authorized Person if Owner is an Entity | Magdalena Tavella  
Print the Security Depositor's Name, or Name & Title if Owner is an Entity | 05/16/2013  
Date |

**Registered Representative Approval:**

The undersigned Registered Representative has carefully reviewed the Questionnaire, this Agreement, and the appropriate supporting documents, and represents to Alpine that to the Registered Representative's best knowledge the information is true and correct and is made in compliance with all applicable federal and state securities laws and regulations.

| Registered Representative Signature | Print Registered Representative Name | 5/23/13  
Date |

Alpine Securities Corporation | Member of FINRA & SIPC

SEC-Scottsdale-E-0004410

**SCOTTSDALE CAPITAL ADVISORS CORP**
7170 E. McDonald Drive, Suite 6, Scottsdale, AZ 85253 Fax. 480-603-4901 Tel. 480-603-4900

## Security Deposit Agreement

| Security Owner Name: Magdalena Tavella | | Account #: |
|---|---|---|
| **Security:** Biozoom, Inc. | BIZM | 1,815,000 |
| Issuer/Company Name: | Symbol: | No. Shares: |

By signing below, Security Owner agrees this Agreement shall govern the deposit, any sale or any transfer of the above Security. This agreement shall be in addition to and supplement any other brokerage agreements pertaining to Security Owner's account(s) held by Scottsdale Capital Advisors (SCA). In the event of a conflict between these other brokerage agreements and this Agreement regarding the subject matter herein, this Agreement shall control.

1. Prior to placing a sell order regarding the Security, Security Owner agrees to provide SCA with information necessary for SCA to determine the "free trading" basis for the Security – i.e., whether a valid registration statement exists governing the transaction or an exemption from the registration requirements of the Security Act of 1933 applies (the "Due Diligence"). The Due Diligence applies whether the stock certificate, if any, contains a restrictive legend or not.

SECURITY OWNER UNDERSTANDS AND AGREES THAT THERE MAY BE SIGNIFICANT DELAYS INVOLVED WITH THE DUE DILIGENCE OF THE SECURITY AND THAT SECURITY OWNER WILL NOT HOLD SCA, INCLUDING ITS DIRECTORS, OFFICERS, AFFILIATES AND EMPLOYEES, LIABLE FOR ANY LOSSES CAUSED DIRECTLY OR INDIRECTLY BY SUCH DELAYS. SCA RESERVES THE RIGHT TO REJECT AND REFUSE TO ACCEPT THE SECURITY DEPOSIT FOR ANY REASON. SECURITY OWNER AGREES NOT TO SELL OR ATTEMPT TO SELL, THE SECURITY UNTIL SECURITY HOLDER HAS RECEIVED A WRITTEN 'READY TO TRADE' NOTICE FROM SCA. SCA MAY, IN ITS SOLE DISCRETION, RESTRICT OR PROHIBIT THE TRANSFER OF THE SECURITY TO OTHER ACCOUNTS VIA JOURNAL, DTC OR OTHER ELECTRONIC TRANSFER.

2. Security Owners agrees to pay all fees and costs associated with the deposit and sale of Security deposit. The 'Trading Commissions and Fees' schedule in SCA's website at www.scottsdalecapital.com, list some of the fees and costs likely to be incurred. The fee schedule is subject to change at any time. You agree to access the fee schedule in SCA's website for the most recent version. The Security Owner understands and agrees the 'Cert Deposit & Processing Fee' is due upon delivery and is non-refundable, even if the Security is not approved for deposit. Security Owner will be subject to the Certificate-Out fee if the file is rejected. Security Owner agrees SCA may impose a reasonable charge for stock deposits requiring additional Due Diligence or trading costs. Additional Due Diligence is currently billed at a rate of $150 to $395 per hour. For costs covered by SCA for special clearance and trading fees, Security Owner agrees to pay for the cost of financing plus interest (12-18% per annum). SCA's clearing firm may have fees in addition to those shown in the fee schedule.

3. Security Owner understands and agrees SCA has incurred substantial expense associated with the Due Diligence and assumes certain regulatory risk as the broker-dealer placing the Security in the market place for trading. To compensate SCA for such expense and risk, Security Owner agrees to sell the Security through SCA. In the event Security Owner transfers (via ACAT, DTC or other electronic means) the Security to another brokerage firm after approval and clearance of the Security by SCA, Security Owner agrees to pay SCA a deferred transaction fee equal to 4.5% of the value of the Security based on the closing price on the day prior to the transfer request. In lieu of paying the transfer fee, Security Owner may elect, at its own expense, to have SCA's clearing firm return any remaining and unsold shares of the Security in physical certificate form to the Security Owner's address.

4. Security Owner represents and warrants to SCA:
   a) Security Owner does not have any material information about the issuer of the Security that has not been publicly disclosed. If prior to the completion of the execution of any sale order or legend/restriction removal, Security Owner obtains any such information, Security Owner will immediately notify SCA so that SCA may terminate the sales or re-legend the certificate until after it has been publicly disclosed.
   b) The information provided by Security Owner during the Due Diligence, including, without any limitation, the information contained in any deposited securities request form, seller's letter, or other questionnaire (the "Seller Information"), is true and correct. Security Owner agrees to keep the Seller Information up to date and current with SCA as long as Security shares are being sold.
   c) The deposit and any sale of the Security comply with Section 5 of the Securities Act of 1933 or any applicable exemption, and all other applicable federal securities laws and regulations.
   d) Neither SCA or any person associated with SCA solicited or recommended the deposit and sale of the Security.

5. Further, the Security Owner understands and agrees to each of the following:
   a) To indemnify and hold SCA harmless from and against any and all claims, damages, liabilities and expenses which SCA incurs as a result of or in connection with any inaccuracy or omission in the Security Owner's responses to the Questionnaire or breach of any warranty of this Agreement.
   b) To cooperate with any internal or external audit or regulatory inquiry relating to the deposit and sale of the Security by providing any information or documentation reasonably requested by SCA to support the information provided in the Questionnaire. This obligation to cooperate will remain in effect after the completion of any sale or transfer of the subject Security.

6. No changes to this Addendum will be accepted unless expressly agreed to in writing by SCA. This Addendum may be executed by facsimile signature, which shall be deemed as an original signature.

ACKNOWLEDGED AND AGREED TO BY SECURITY OWNER:

| Magdalena Tavella | *(signature)* | May 16, 2013 |
|---|---|---|
| (Authorized Signer Name) | (Authorized Signer Signature) | (Date) |

(SCA: 11-2011)

SEC-Scottsdale-E-0004411