UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
---------------------------------------X
SECURITIES AND EXCHANGE COMMISSION,

                Plaintiff,

      - against -

MAGDALENA TAVELLA, ANDRES HORACIO
FICICCHIA, GONZALO GARCIA BLAYA,
LUCIA MARIANA HERNANDO, CECILIA DE
LORENZO, ADRIANA ROSA BAGATTIN,
DANIELA PATRICIA GOLDMAN,
MARIANO PABLO FERRARI, MARIANO
GRACIARENA, and FERNANDO LOUREYRO,

              Defendants.
---------------------------------------X

**MEMORANDUM AND ORDER**

13 Civ. 4609 (NRB)

**NAOMI REICE BUCHWALD**
**UNITED STATES DISTRICT JUDGE**

Plaintiff Securities and Exchange Commission (the "SEC" or the "Commission") moves for entry of default judgment against Magdalena Tavella, Andres Horacio Ficicchia, Gonazalo Garcia Blaya, Lucia Mariana Hernando, Cecilia De Lorenzo, Adriana Rosa Bagattin, Daniela Patricia Goldman, and Mariano Pablo Ferrari (collectively "defendants").[1]  While we are persuaded that the Commission has established its entitlement to a default judgment, we disagree in part with the Commission's proposed remedies.  We write principally to explain this disagreement.

---

[1] The complaint calls these eight parties the "Selling Defendants."  Compl. ¶ 1.  Two others, Mariana Graciarena and Fernando Loureyro, have settled with the Commission.  We ignore Graciarena and Loureyo herein except to emphasize that this opinion contains no findings or conclusions as to them.

## I.  BACKGROUND

**A.  The Biozoom Scheme**

The factual allegations of the complaint, which we describe here insofar as they are relevant, revolve around a penny-stock company called Biozoom, whose shares were traded on the Over-the-Counter Bulletin Board.  Compl. ¶¶ 1, 113.

Biozoom was incorporated in Nevada in 2007 as Entertainment Arts, Inc. ("Entertainment Art").  Id. ¶ 27.  Entertainment Art originally represented that it was in the business of designing and marketing leather bags.  Id.  Its stock was divided among three corporate officers and thirty-four outside investors.  Id. ¶¶ 28-30.  In May 2009, Entertainment Art disclosed that the three officers had sold their holdings to a Belize entity called Medford Financial Ltd.  Id. ¶ 31.  Although it was not disclosed, Medford Financial actually purchased all of the stock in Entertainment Art, including the shares held by outside investors.  Id. ¶¶ 32-33.

In October 2012, Medford Financial announced that it had sold 39,600,000 shares of Entertainment Art stock to Le Mond Capital, a British Virgin Islands entity.  Id. ¶¶ 35-36.  In fact, Le Mond Capital purchased all 59,730,000 shares.  Id. ¶ 37.  Le Mond Capital is owned by Sara Deutsch, who is not a party to this action.  Id. ¶ 38.  Deutsch was appointed as "Entertainment Art's new President, Chief Executive Officer,

Principal Executive Officer, Treasurer, Chief Financial Officer, Secretary, . . . and Director." Id. Deutsch also is or was a co-owner, with defendant Tavella, and the manager of a restaurant in Buenos Aires, Argentina. Id. ¶ 39.

Defendants are eight residents of Buenos Aires. Id. ¶¶ 14-21. In January to May 2013, each defendant separately opened an account at one of two United States broker-dealers, and they deposited a combined total of 15,685,000 shares of Entertainment Art stock in those accounts. Id. ¶¶ 46-47, 57, 64, 70, 77, 83, 89, 95, 101. Each defendant represented to the broker-dealers that he or she had acquired the shares in November 2012 through March 2013 in private transactions with individuals who either were among the thirty-four original outside investors or had purchased from those investors. These representations were false, because Medford Financial had acquired all of those shares years earlier. Id. ¶¶ 32, 54-56, 61-63, 67-69, 74-76, 80-82, 86-88, 92-94, 98-100. Defendants also represented that they had paid amounts ranging from $5,445 to $31,050 each, and totaling $84,260, for these shares. Id. ¶¶ 54, 56, 62, 68, 75, 81, 87, 93, 99.

In March and April 2013, Entertainment Art changed its name to Biozoom and announced that, following a transaction involving the acquisition of patents and other intellectual property, it was now in the biomedical industry. Id. ¶¶ 40-41, 45. Sara

Deutsch remained a director, but not an officer, of Biozoom. Id. ¶ 42. On May 22, 2013, Biozoom and other entities began to tout that Biozoom had "'created the world's first portable, handheld consumer device' to instantly and non-invasively measure certain biomarkers." Id. ¶ 106. This promotional campaign caused a dramatic increase in Biozoom's stock price, which peaked at over $4 per share. Id. ¶ 6.

Also beginning in May 2013, defendants began to sell their shares in transactions that were neither registered with the SEC nor exempt from the registration requirement of the Securities Act of 1933 (the "1933 Act"). Id. ¶¶ 107, 111. Between May 16 and June 19, defendants used emails and instant messages to instruct their U.S. broker-dealers to sell 14,078,406 shares for a total of $33,421,062. Id. ¶¶ 107-108.[2] In June, seven defendants sought to wire some or all of these proceeds to foreign bank accounts, successfully moving a total of approximately $15,990,000 abroad. Id. ¶ 109; but see id. ¶ 1 ("almost $17 million"). On June 25, the Commission issued an

---

[2] Paragraph 107 of the complaint alleges that the total proceeds were $33,997,152, but it is followed by a table containing line items for each defendant's "[p]roceeds" totaling $33,421,062. This discrepancy corresponds to the two manners in which the proceeds of four defendants can be calculated, as described in Part II.C.2 below. As we explain there, the lower calculation of these defendants' proceeds is correct for present purposes.

order suspending trading in Biozoom stock. Id. ¶ 109; see SEC Release No. 34-69841 (June 25, 2013).


**B.  Procedural History**

On July 3, 2013, the Commission commenced this action, and we granted the Commission's ex parte application for a temporary restraining order that included a freeze of defendants' Biozoom shares and proceeds from the sales of Biozoom shares. On July 16, defendants having retained McLaughlin & Stern, LLP, a New York law firm, the parties stipulated to the entry of a preliminary injunction including a revised version of the asset freeze. We so-ordered the preliminary injunction on July 17, and we ordered defendants to answer or otherwise respond to the complaint by August 26.

On September 11, 2013, McLaughlin & Stern moved to withdraw as counsel for reasons described in an ex parte submission. The Court granted the motion, which the Commission did not oppose. On December 17, 2013, we signed a scheduling order directing defendants to answer or otherwise respond to the complaint by February 3, 2014. This order provided that "[f]ailure to answer or otherwise respond to the complaint by that date may result in entry of a default judgment against the Defendants." On February 3, 2014, Brafman & Associates, another New York law firm, appeared on behalf of defendants and applied for a further

thirty-day extension, which we granted.  However, on March 14, 2014, Brafman & Associates applied to withdraw as counsel.  We granted this application, which the Commission did not oppose.

On May 15, 2014, the Clerk of Court certified defendants' default pursuant to Fed. R. Civ. P. 55(a), and on June 4, 2014, the SEC filed the instant motion.  The Commission served the motion papers on defendants in a manner consistent with the July 16, 2013 stipulation.

In June and July 2014, we engaged in correspondence with Juan Ignacio Prada, an Argentinian lawyer who claimed to represent defendants.[3]  Prada requested leave for some defendants to "respond Pro Seo [sic] to the Commission's Complaint, via the expertise of Mr. Juan Ignacio Prada, our Argentinian counsel since [defendants] are unable to retain proper US counsel due to lack of funds."  We responded that "[t]here is no mechanism available that would enable a party to be represented in a U.S. action by foreign counsel while simultaneously appearing pro se.  Accordingly, this Court cannot grant your request."  Prada replied that "[n]otwithstanding there is no mechanism available to be represented by a foreign counsel, the defendants would like to bring before the court all the documents regarding the commercial transactions.  If this is available, please let us

---

[3]  The Court copied the Commission's counsel on this correspondence.

know and the defendants will send them." We responded that "there is no prohibition on individual defendants appearing pro se -- i.e. representing themselves -- and, in that capacity, making submissions to the Court." Subsequently, the Commission served a copy of its motion papers on Prada.

We have not since heard from defendants or anyone on their behalf.

## II.  DISCUSSION

### A.  Default Judgment

Rule 55 of the Federal Rules of Civil Procedure permits the entry of a default judgment against a party who "has failed to plead or otherwise defend." Fed. R. Civ. P. 55(a). Here, although two New York law firms appeared for defendants, both firms were permitted to withdraw. Defendants have failed to answer or otherwise response to the complaint, even though the deadline to answer, having been extended multiple times, lapsed over ten months ago. Further, we warned defendants in our December 17, 2013 order that failure to defend "may result in entry of a default judgment," and in July 2014, we informed defendants' Argentinian lawyer that defendants may represent themselves. Defendants' prolonged inaction warrants imposition of a default judgment.

By their default, defendants are deemed to concede the complaint's well-pleaded allegations of liability, but not of the amount of damages.  Greyhound Exhibitgroup, Inc. v. E.L.U.L. Realty Corp., 973 F.2d 155, 158 (2d Cir. 1992).  Thus, we "accept[] as true all of the factual allegations of the complaint, except those relating to damages."  Au Bon Pain Corp. v. Artect, Inc., 653 F.2d 61, 65 (2d Cir. 1981).  However, we must independently establish the damages and other relief to be awarded on the basis of sufficient evidence.  Cement & Concrete Workers Dist. Council Welfare Fund v. Metro Found. Contractors Inc., 699 F.3d 230, 234 (2d Cir. 2012) ("Cement Workers"); SEC v. Mgmt. Dynamics, Inc., 515 F.2d 801, 814 (2d Cir. 1975).

To make the necessary findings upon default, a court may conduct a hearing to, inter alia, "conduct an accounting," "determine the amount of damages," or "investigate any other matter."  Fed. R. Civ. P. 55(b)(2)(A), (B), (D).  However, it is within a court's discretion to "determine there is sufficient evidence . . . based . . . upon a review of detailed affidavits and documentary evidence."  Cement Workers, 699 F.3d at 234.

Here, the SEC has submitted the detailed declaration of Ricky Sachar, Esq., dated June 4, 2013 (the "Sachar Declaration"), including numerous exhibits that, inter alia, fully detail defendants' trading activity.  As this submission adequately supports the remedies we will impose, there is no

need for an evidentiary hearing.   However, as discussed in Part II.C.3 below, we delay the entry of final judgment to permit the Commission an opportunity to supplement its presentation as to the subject of prejudgment interest.

**B.   Liability**

The facts established by defendants' default support the conclusion that defendants violated Section 5 of the 1933 Act. Section 5 "requires that securities be registered with the SEC before any person may sell or offer to sell such securities." SEC v. Cavanagh, 445 F.3d 105, 111 (2d Cir. 2006) ("Cavanagh II"); see 15 U.S.C. § 77e.   "To state a cause of action under Section 5, one must show (1) lack of a registration statement as to the subject securities; (2) the offer or sale of the securities; and (3) the use of interstate transportation or communication and the mails in connection with the offer or sale."   Cavanagh II, 445 F.3d at 111 n.13 (internal quotation marks omitted).   Although some securities sales are exempt from the Section 5 registration requirement, "[o]nce a prima facie case has been made, the defendant bears the burden of proving the applicability of an exemption."   Id. (citing SEC v. Ralston Purina Co., 346 U.S. 119, 126 (1953)).   Furthermore, "Section 5 imposes strict liability on offerors and sellers of unregistered securities regardless of any degree of fault, negligence, or

intent on the seller's part." SEC v. Bronson, 14 F. Supp. 3d 402, 408 (S.D.N.Y. 2014) (internal quotation marks omitted).

In May and June 2013, defendants used international emails and instant messages to sell their Biozoom shares in unregistered transactions. Thus, the SEC has made out a prima facie case that defendants violated Section 5. Defendants have not made any effort to show the applicability of an exemption from the registration requirement, and we are not aware of any applicable exemption. Thus, defendants violated Section 5.

## C.   Remedies

The Commission seeks (1) a permanent injunction; (2) disgorgement of the proceeds of the illegal sales; (3) disgorgement of prejudgment interest on those proceeds; and (4) civil penalties in the same amount as the proceeds to be disgorged. We address each remedy in turn.

### 1.   Permanent Injunction

Section 20(b) of the 1933 Act expressly authorizes the SEC to seek an order enjoining "acts or practices which constitute or will constitute a violation of the provisions of this [Act]." 15 U.S.C. § 77t(b). The basis for ordering such an injunction must be "a substantial likelihood of future violations of illegal securities conduct." SEC v. Cavanagh, 155 F.3d 129, 135

(2d Cir. 1998) ("Cavanagh I").  To determine whether the SEC has established this substantial likelihood, a court is to consider the following factors:

> the fact that the defendant has been found liable for illegal conduct; the degree of scienter involved; whether the infraction is an "isolated occurrence;" whether defendant continues to maintain that his past conduct was blameless; and whether, because of his professional occupation, the defendant might be in a position where future violations could be anticipated.

Id. (quoting SEC v. Commonwealth Chem. Secs., Inc., 574 F.2d 90, 100 (2d Cir. 1978)).  A permanent injunction is "particularly within the court's discretion where a violation was founded on systematic wrongdoing, rather than an isolated occurrence."  SEC v. First Jersey Secs., Inc., 101 F.3d 1450, 1477 (2d Cir. 1996) ("First Jersey") (internal quotation marks omitted).

The relevant factors amply support a permanent injunction. Defendants displayed scienter by falsely representing to their American broker-dealers that they had acquired their Entertainment Art stock from individual investors.  That they engaged in parallel conduct strongly supports the inference that they were engaged in coordinated wrongdoing.  Unwary investors are all too vulnerable to market manipulation of the type that

evidently took place here.  Thus, we will not hesitate to grant the injunction proposed by the Commission.[4]

## 2.  Disgorgement of Illegal Proceeds

The equitable remedy of disgorgement, which "serves to remedy securities law violations by depriving violators of the fruits of their illegal conduct," SEC v. Contorinis, 743 F.3d 296, 301 (2d Cir. 2014) ("Contorinis"), is "well-established . . . in securities enforcement actions," Cavanagh II, 445 F.3d at 116.  Indeed, "[t]he deterrent effect of an SEC enforcement action would be greatly undermined if securities law violators were not required to disgorge illicit profits." SEC v. Manor Nursing Ctrs., Inc., 458 F.2d 1082, 1104 (2d Cir. 1972).  "The amount of disgorgement ordered 'need only be a reasonable approximation of profits causally connected to the violation'; 'any risk of uncertainty [in calculating disgorgement] should fall on the wrongdoer whose illegal conduct created that uncertainty.'" First Jersey, 101 F.3d at 1475 (quoting SEC v. Patel, 61 F.3d 137, 139-40 (2d Cir. 1995)).  However, because the disgorgement "remedy is remedial rather than punitive, the court may not order disgorgement above" "the amount of money

---

[4] The same reasons justify the proposed order permanently barring defendants from participating in an offering of penny stock.  See 15 U.S.C. § 77t(g).

acquired through wrongdoing . . . plus interest." Cavanagh II, 445 F.3d at 116 & n.25.

Here, the Commission seeks to disgorge the proceeds of defendants' illegal sales. Disgorgement is appropriate to prevent defendants from profiting from their violations of the securities laws. A reasonable approximation of the amount to be disgorged is the difference between the amounts that each defendant obtained for his or her shares and the amount that that defendant stated that he or she paid for them.

The Commission has provided ample evidence of defendants' proceeds. We have carefully reviewed the Sachar Declaration and its supporting exhibits, which enumerate each of defendants' Biozoom sales. We concur in the Commission's calculation of the amounts to be disgorged by Goldman, Baggatin, Ferrari, and Tavella, which correspond to the complaint's allegations. See Sachar Decl. ¶¶ 27, 29, 30, 32, 33, 35, 36, 38 & Exs. 12-19; Compl. ¶¶ 81, 87, 93, 99, 107.

In contrast, the disgorgement amounts that the Commission proposes for the other defendants exceed those defendants' true net proceeds as reflected in the Commission's exhibits. First, we note a $15 error in the Commission's transcription of the amount Blaya reported paying for his shares. Compare Sachar

Decl. ¶ 18, <u>with</u> <u>id.</u> Ex. 6, at 1.[5]   More significantly, as to Ficicchia, Blaya, De Lorenzo, and Hernando, the SEC staff appears to have calculated the proceeds by multiplying the number of shares sold by the selling price.   However, the exhibits demonstrate that their actual proceeds were lower due to commissions and fees paid on the trades.   <u>Compare</u> Sachar Decl. ¶¶ 17, 20, 23, 26, <u>with</u> <u>id.</u> Exs. 5, 7, 9, 11.   The lower figures, which we have recalculated on the basis of the actual amounts deposited in those four defendants' brokerage accounts, as shown in the exhibits, match the complaint's line-item allegations as to those defendants' "[p]roceeds."   Compl. ¶ 107. This provides an independent basis for adopting the lower calculation, since "[a] default judgment must not . . . exceed in amount[] what is demanded in the pleadings."   Fed. R. Civ. P. 54(c).[6]

Accordingly, we will order that defendants disgorge the following amounts of principal:   Tavella, $3,107,819; Ficicchia, $1,948,339; Blaya, $3,008,200; Hernando, $5,042,771; De Lorenzo, $4,801,536;   Baggatin, $6,216,380;   Goldman, $3,764,306;   and Ferrari, $5,447,450.

---

[5] The complaint alleges the proper purchase price, which is $6,765.   Compl. ¶ 62.

[6] Our method for recalculating the proceeds of Ficicchia, Blaya, De Lorenzo, and Hernando is also consistent with the method by which the SEC staff appears to have calculated the proceeds of Goldman, Baggatin, Ferrari, and Tavella, as reflected in both the complaint and the Sachar Declaration.

### 3.  Disgorgement of Prejudgment Interest

It is also within a court's discretion to order disgorgement of prejudgment interest on the principal amount to be disgorged, so as to "to deprive the wrongdoer of the benefit of holding the illicit gains over time by reasonably approximating the cost of borrowing such gain from the government." Contorinis, 743 F.3d at 308.  As a general matter, the Second Circuit has approved the calculation of prejudgment interest at the IRS underpayment rate, which "reflects what it would have cost to borrow the money from the government and therefore reasonably approximates one of the benefits the defendant derived from its [illegal conduct]." First Jersey, 101 F.3d at 1476.

Last year, in an opinion not cited in the Commission's brief, the Second Circuit limited the availability of disgorgement of prejudgment interest as to funds frozen at the government's behest. SEC v. Razmilovic, 738 F.3d 14, 36–38 (2d Cir. 2013) ("Razmilovic"), cert. denied, 134 S. Ct. 1564 (2014). In Razmilovic, the defendant challenged the district court's award of prejudgment interest at the IRS underpayment rate, see SEC v. Razmilovic, 822 F. Supp. 2d 234, 279 (E.D.N.Y. 2011), on the ground that the government had caused some of his funds in a foreign account to be frozen in anticipation of forfeiture in a

pending  criminal  case.    The  Circuit  found  merit  in  the
defendant's argument, explaining as follows:

> [I]t is within the discretion of a court to award
> prejudgment interest on the disgorgement amount for
> the period during which a defendant had the use of his
> illegal profits, see, e.g., First Jersey, 101 F.3d at
> 1474-77.  However, where, as here, the defendant has
> had some or all of his assets frozen at the behest of
> the government in connection with the enforcement
> action, an award of prejudgment interest relating to
> those funds would be inappropriate with respect to the
> period covered by the freeze order, for the defendant
> has already, for that period, been denied the use of
> those assets.  In such a case, after a final order of
> disgorgement, the funds previously frozen would
> presumably be turned over to the government in
> complete or partial satisfaction of the disgorgement
> order, along with any interest that has accrued on
> them during the freeze period.  In that circumstance,
> the remedial purpose of prejudgment interest would
> already have been served with respect to the period of
> the freeze; to require the defendant to pay
> prejudgment interest on the entire disgorgement amount
> including the earlier frozen amount would, for the
> freeze period, deprive him twice of interest on the
> portion of the disgorgement award that is satisfied by
> the frozen assets.

738 F.3d at 36-37 (emphases added).[7]

     We interpret Razmilovic to mean that when a defendant's
funds have been frozen in connection with an enforcement action,
the defendant may not be ordered to disgorge prejudgment

---

[7] The Razmilovic court remanded to permit the government to
clarify whether the frozen funds would be applied to the
disgorgement order, in which case prejudgment interest would not
be allowed, or would remain frozen in connection with the
criminal charges pending against the defendant, in which case
prejudgment interest on non-frozen funds would be allowed.  738
F.3d at 37-38.  But here, there is no question that the frozen
funds are those subject to disgorgement.

interest at the IRS underpayment rate.  As noted earlier, that rate is intended to "reasonably approximate[] . . . the benefit[] the defendant derived from" the time value of possession of the defendant's ill-gotten gains, First Jersey, 101 F.3d at 1476; but where a defendant's funds are frozen, if the freeze is not violated, the defendant derives no such possessory benefit for the duration of the freeze.  Yet Razmilovic also recognizes that frozen funds "turned over to the government in complete or partial satisfaction of the disgorgement order" should be turned over "along with any interest that has accrued on them during the freeze period." 738 F.3d at 36.  Otherwise, a defendant might perversely benefit from the asset freeze by pocketing accumulated returns on the frozen principal.[8]

Here, the Commission seeks prejudgment interest running from July 1, 2013.  See Sachar Decl. ¶¶ 39-46 & Exs. 20-27. However, we ordered a worldwide freeze on defendants' relevant

---

[8] Similarly, in the Rules of Practice applicable to its own proceedings, the SEC recognizes that the IRS underpayment rate may be inappropriate for funds secured in anticipation of disgorgement.  See 17 C.F.R. § 201.600(b) (Although "[i]nterest on the sum to be disgorged shall be computed at the [IRS] underpayment rate of interest," "[t]he Commission or the hearing officer may, by order, specify a lower rate of prejudgment interest as to any funds which the respondent has placed in an escrow . . . .").

assets in our orders of July 3 and 17, 2013.[9]  While it is possible that our freeze orders have been violated, the SEC does not provide any evidence of such violation.  Nor does the SEC offer any information as to the actual returns, if any, that have accumulated on the frozen assets.  On the current record, in light of Razmilovic, we could merely order disgorgement of any actual returns on the frozen assets, without specifying the amount of such returns.

However, we will defer entering judgment to afford the Commission an opportunity to establish the actual amount of the returns, if any, that have accumulated on the frozen assets.  If the Commission does so, we will be inclined to incorporate those amounts in our final judgment.  Alternatively, if the Commission can show that defendants have violated the asset freeze as to any of the funds subject to that freeze, the Commission may renew its request for disgorgement of prejudgment interest as to those funds at the IRS underpayment rate.

### 4.  Civil Penalties

Section 20(d) of the Securities Act provides that, in an enforcement action brought by the Commission, "the court shall

---

[9] After filing the instant motion, the Commission informed us by letter that authorities in Belize and Cyprus have also ordered defendants' assets within those countries to be frozen. Doc. No. 52, at 2.

have jurisdiction to impose, upon a proper showing, a civil penalty to be paid by the person who committed such violation." 15 U.S.C. § 77t(d)(1). Section 20(d) "authorizes three tiers of monetary penalties for statutory violations." Razmilovic, 738 F.3d at 38. Each of the three tiers "provides that, for each violation, the amount of penalty 'shall not exceed the greater of' a specified monetary amount or the defendant's 'gross amount of pecuniary gain'; the amounts specified for an individual defendant for the first, second, and third tiers, respectively, are $[7,500], $[80,000], and $[160,000]," id. (quoting 15 U.S.C. § 77t(d) (emphasis in Razmilovic)); see 17 C.F.R. § 201.1005 (adjusting statutory maximum penalties for inflation). The third, most serious tier, requires a showing that "the violation . . . involved fraud, deceit, manipulation, or deliberate or reckless disregard of a regulatory requirement" and "such violation directly or indirectly resulted in substantial losses or created a significant risk of substantial losses to other persons." 15 U.S.C. § 77t(d)(2)(C)(I)-(II).

Subject only to the applicable maximum, "[t]he amount of the penalty shall be determined by the court in light of the facts and circumstances." 15 U.S.C. § 77t(d)(2)(A). Thus, "[b]eyond setting maximum penalties, the statute[] leave[s] 'the actual amount of the penalty . . . up to the discretion of the

district court." Razmilovic, 738 F.3d at 38 (quoting SEC v. Kern, 425 F.3d 143, 153 (2d Cir. 2005)).

"In determining whether civil penalties should be imposed, and the[ir] amount," SEC v. Wyly, --- F. Supp. 3d. ---, ---, 2014 WL 4792229, at *4 (S.D.N.Y. 2014) (internal quotation marks omitted), courts in this District have

> look[ed] to a number of factors, including (1) the egregiousness of the defendant's conduct; (2) the degree of the defendant's scienter; (3) whether the defendant's conduct created substantial losses or the risk of substantial losses to other persons; (4) whether the defendant's conduct was isolated or recurrent; and (5) whether the penalty should be reduced due to the defendant's demonstrated current and future financial conduction.

Id. (quoting SEC v. Opulentica, LLC, 479 F. Supp. 2d 319, 331 (S.D.N.Y. 2007) ("Opulentica")). But although "these factors are helpful in characterizing a particular defendant's actions, . . . each case 'has its own particular facts and circumstances which determine the appropriate penalty to be imposed.'" Opulentica, 479 F. Supp. 2d at 331 (quoting SEC v. Moran, 944 F. Supp. 286, 297 (S.D.N.Y. 1996)).

Here, "the Commission seeks to impose a penalty against each of the [defendants] equal to his or her gross pecuniary gain from the sale of Biozoom shares, i.e., the disgorgement amount for each [defendant]." Br. at 14. In other words, the Commission seeks civil penalties in the maximum amounts allowed by statute, which range from approximately $2.0 million to $6.2

million per defendant.  The Commission's brief makes no case-specific argument whatsoever in support of the magnitude of these proposed penalties.  Instead, the Commission states only that "[c]ourts have routinely imposed civil penalties equal to the gross amount of a defendant's pecuniary gain," Br. at 14,[10] and that "[a] penalty is appropriate given the massive selling of shares in an unregistered distribution of securities -- an unregistered distribution of which purchasers and sellers of [Biozoom] stock were unaware when they made their investment decisions," Br. at 14-15.  Such cursory presentation is scarcely adequate for a law enforcement agency seeking to invoke the Court's discretion to impose multiple multi-million-dollar fines.

A civil penalty is plainly appropriate to punish defendants' illegal conduct.  Yet the Commission's submission leaves us with many unanswered questions.  Beyond the bare facts pertaining to defendants' deposits and sales of Biozoom stock, practically the only thing we know about defendants is their occupations, which shed little light on the circumstances.[11]

---

[10] Perhaps tellingly, this statement is supported only by out-of-circuit decisions, whose persuasive value is undermined by the lack of any attempt to demonstrate their factual similarity to this case.

[11] In opening their brokerage accounts, defendants reported the following professions:  Ficicchia, "Self-employed music producer"; Blaya, "Music producer-stock investments"; Hernando, "Marketing Manager"; De Lorenzo, "Self-employed marketing

Most importantly, we do not know what defendants' role in the Biozoom scheme was.  Did defendants orchestrate that scheme, or was Sara Deutsch or some other master pulling their strings?  Did defendants personally participate in the campaign to promote Biozoom to unwary investors?  Were defendants the profiteers or mere pawns?  Answers to these questions would have illuminated this otherwise obscure portrait.

A third-tier penalty is justified because, as already discussed, defendants' illegal conduct was undertaken with some degree of scienter, and because we infer that it caused substantial collective losses to investors.  The amount of money acquired through the Biozoom scheme further justifies a penalty in an amount that Congress and the Commission, in the exercise of its rulemaking authority, have deemed weighty.  And we will not reward defendants for their decision to default and thus to deprive the Commission of an opportunity to take discovery into their roles in the scheme.  However, we decline to assess the maximum penalties, on top of disgorgement, in the absence of a basis to conclude that such penalties are proportionate to defendants' culpability.  Accordingly, we award civil penalties in the amount of $160,000 against each defendant.

---

specialist"; Tavella, "Attorney practicing administrative, political, intellectual property, and patent law"; Bagattin, "Retired Teacher"; Ferrari, "Sales and Marketing"; Goldman, "Delicatessen owner."  Compl. ¶ 48.  As noted above, Tavella is also part owner, with Sara Deutsch, of a restaurant.  Id. ¶ 39.

**CONCLUSION**

The Commission's motion for a default judgment (Doc. No. 45) is granted on the foregoing terms. However, we defer entering judgment to afford the Commission an opportunity to supplement its submission as to the amount of prejudgment interest that should be disgorged. Such supplemental submission shall be due on January 23, 2015.


Dated:      New York, New York
            January 6, 2015


                                    NAOMI REICE BUCHWALD
                                    UNITED STATES DISTRICT JUDGE

23